**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **RODNEY REED,** | § | |
| | § | |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **No. A-02-CA-142 LY** |
| | § | |
| **RICK THALER,** | § | |
| | § | |
| **Respondent** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

The Magistrate Court submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. §636(b) and Rule 1 of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges, as amended.

Before the Court are: Petitioner's Second Amended Petition for Habeas Corpus Under 28 U.S.C. § 2254 (Clerk's Doc. No. 137), Respondent Thaler's Answer and Motion for Summary Judgment (Clerk's Doc. No. 150), and Petitioner's Response to Respondent's Motion for Summary Judgment and Answer (Clerk's Doc. No. 158).

## I.  CLAIMS PRESENTED

In 1998, Rodney Reed was convicted of the capital murder of Stacy Stites and sentenced to death by a Bastrop County, Texas jury.  For more than a decade, Reed's attorneys have sought redress in both federal and state court.  After a series of appeals and state habeas petitions, Reed's

case returns to this Court on a federal writ of habeas corpus.  In his Second Amended Petition, Reed

asks the Court to consider the following claims:[1]

1.      Reed is actually innocent of the capital murder of Stacey Stites.

2.      The State deprived Reed of due process by suppressing evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), including:

     a.      The results of DNA tests performed on two beer cans by the Texas Department of Public Safety Crime Laboratory ("DPS crime lab");

     b.      Martha Barnett's statement that she saw Stites with Stites's fiancé Jimmy Fennell in the early morning hours on the day of her murder;

     c.      Mary Blackwell's statement that she overheard Fennell state that he would choke Stites with a belt if he ever caught her cheating on him;

     d.      Statements from Brenda, Jennifer, and Paul Prater that they saw Stites in the early morning hours on the day that she was murdered with persons other than Reed;

     e.      Pam Duncan's statement that Fennell was controlling and abusive during their dating relationship;

     f.      Evidence that Fennell and other Giddings police officers engaged in a pattern of brutality when interrogating suspects;

     g.      Evidence that the Bastrop County Sheriff was engaged in crimes of moral turpitude at the same time the Bastrop County Sheriff's Office was investigating Stites's murder;

     h.      Statements made by Giddings police officer David Hall regarding Fennell during Stites's murder investigation; and

     i.      Wendy Wallace's statement that she was stalked and harassed by Fennell and Hall while they were on duty as Giddings Police Officers.

---

[1]The list of claims comes from Reed's Corrected Second Amended Petition for Writ of Habeas Corpus (Clerk's Doc. No. 147), and specifically from the "Claims for Relief" section of the Table of Contents of that document, *id.* at pp. ii–viii, although the numbering scheme is slightly different in this Report and Recommendation than in Reed's petition.

3.      Reed was deprived of his Sixth Amendment right to effective assistance as a result of trial counsel's failure to perform adequately, by failing to:

   a.      Properly investigate and discover information prior to trial concerning:

      1.      Assertions by the Praters that they saw Stites on the night of her murder with people other than Reed.

      2.      Fennell's propensity for violence; and

      3.      Reed's prior relationship with Stites;

   b.      Effectively impeach the State's forensic evidence; and

   c.      Timely offer the statements of Neal Hawken and Jason Allison into evidence during the guilt-innocence phase of his trial;

4.      The cumulative effect of Reed's *Brady* allegations and his ineffective assistance of counsel claims undermines confidence in the outcome of the trial;

5.      The State knowingly presented false and misleading testimony regarding Fennell in violation of Reed's Fourteenth Amendment right to due process;

6.      The Texas death penalty statute under which Reed was convicted unconstitutionally prohibits the jury from being informed during the punishment phase about the effect of a single negative vote;

7.      Reed was deprived of his rights under the Eighth and Fourteenth Amendments when evidence of an extraneous offense for which Reed had previously been acquitted was admitted during the punishment phase of his trial;

8.      Reed's right to due process under the Fourteenth Amendment was violated when, during closing argument, the State implied that defense counsel had suborned perjury;

9.      Reed's Fifth and Fourteenth Amendment rights were violated when the State commented on his failure to testify;

10.     The trial court interfered with Reed's Sixth and Fourteenth Amendment right to prepare a defense by:

   a.      Refusing to grant Reed's motion for a continuance;

   b.      Excluding Jimmy Fennell's polygraph test results;

3

      c.      Appointing counsel for two witnesses during the guilt/innocence phase of trial; and

      d.      Allowing the State to introduce evidence during the punishment phase of an extraneous offense for which he was previously acquitted;

11.      Reed's Sixth Amendment right to counsel was violated because appellate counsel labored under an actual conflict of interest;

12.      Reed's appellate counsel rendered ineffective assistance by failing to raise meritorious points of error on direct appeal in violation of his Sixth Amendment right to counsel;

13.      Reed's death sentence violates the Sixth, Eighth, and Fourteenth Amendments because the State was not required to prove the mitigation special issue beyond a reasonable doubt as required by the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S.466 (2000), and *Ring v. Arizona*, 536 U.S. 458 (2002).

## II.  GENERAL BACKGROUND

### A.    Factual Background

In its 2008 opinion, the Court of Criminal Appeals provided a very detailed account of the facts that were developed in Reed's trial, as well as in the post-conviction proceedings. *Ex parte Reed*, 271 S.W.3d 698, 702–712; 713–15; 717–26 (Tex. Crim. App. 2008).  Given this detailed account, there would be no purpose in this Court restating all of those facts.  Accordingly, the Court will rely on that statement, and only briefly summarize the facts here.

Stacey Stites's body was found in the afternoon on April 23, 1996, on the side of a country road in Bastrop County, Texas.  Upon the discovery of her body, the City of Bastrop Police and Bastrop County Sheriff's Departments joined forces with the Texas Rangers to investigate her apparent rape and murder.  The lead investigator was Texas Ranger L.T. Wardlow.  Over the subsequent eleven months, the authorities' investigation focused on Stites's acquaintances, particularly her fiancé, Jimmy Fennell.  HEB, Stites's employer, offered a $50,000 reward, and the police identified roughly thirty male suspects.  Even after Fennell provided a blood sample, which

excluded him as the donor of semen found in and on Stites's body, the authorities continued to pursue him as a suspect. Ranger Wardlow interrogated Fennell multiple times and the authorities attempted to discover scenarios that would have made it possible for him to have been both at the murder scene at the time of the murder, and also at his apartment 35 miles away between 6:30 and 7:00 a.m. the same morning, where Stites's mother testified she spoke with him.

Eventually, a match was discovered between the DNA found at the scene and the DNA of Rodney Reed, a Bastrop resident who lived near the location at which Fennell's truck was found. After providing Reed with his *Miranda* warnings, the police interviewed him and he denied knowing Stites. In May of 1997, the State charged Reed with capital murder. The jury convicted him, and after a separate punishment hearing, sentenced him to death.

## B.    Procedural History

Reed appealed his conviction on several grounds, including that the evidence was factually insufficient. The Court of Criminal Appeals (CCA) rejected his claims, holding that "the strength of the DNA evidence connecting [Reed] to the sexual assault on [Stites] and the forensic evidence indicating that the person who sexually assaulted [her] was the person who killed her, a reasonable jury could find that [Reed] is guilty of the offense of capital murder." *Reed v. State*, No. AP–73,135, at *9 (Tex. Crim. App. 2000). The CCA thus affirmed Reed's conviction and sentence. *Id.* at 22.

### 1.    Initial state habeas proceedings

Reed has filed numerous state habeas petitions. Reed filed an initial petition in November of 1999. In February 2001, before the CCA ruled on this petition, Reed filed a supplemental claim. The following February, the CCA denied his first petition and construed the supplement as a subsequent application. In Reed's second application, he claimed that the prosecution failed to turn

5

over to defense attorneys a letter from a crime scene investigator to Lisa Tanner, the lead prosecutor. In the letter, the investigator, Wilson Young, provided the results of DNA tests on beer cans found near the murder scene.  The report stated that neither Stites, Officer Hall (Fennell's neighbor, good friend, and fellow police officer), nor Investigator Selmala (one of the first respondents from Bastrop Police Department who arrived at the crime scene and, years later, committed suicide, which prompted an investigation as to whether he may have been involved in the murder), could be excluded as possible sources of DNA found on the beer can.  Reed argued that *Brady v. Maryland* compelled the prosecution to turn over the letter to his defense attorneys, and the failure to do so merited habeas relief.

The trial judge held an evidentiary hearing on this claim.  The letter was dated May 13, 1998, during the defense's case-in-chief.  Dr. Elizabeth Ann Johnson, the defense's DNA expert, was scheduled to testify the next day.  The prosecution had not planned on performing testing on the beer cans, because Ranger Wardlow felt the cans had been at the scene longer than Stites's body. However, Reed's defense team wanted to test the cans, so Young and Dr. Johnson swabbed the cans and performed DNA tests.  When Dr. Johnson testified, she did not discuss the results from the DNA testing on the beer cans.

In the post-conviction evidentiary hearing, Tanner admitted that she learned of Young's test results on May 13th, and she believed that she gave a copy of the letter to the defense at that time, though she was not certain of that.  Her uncertainty stemmed from the prosecution team's standard procedure for disclosing documents during trial having "broken down."  Ordinarily, when documents were produced to the defense, the prosecution made four copies: one for the district clerk, one for the prosecution, and two for the defense.  But when Tanner reviewed her file, she found three copies

in her file and the district clerk did not have a copy.  Therefore, she assumed that she gave the last copy to the defense.  Because Tanner felt that Young's results were potentially exculpatory, she ordered further testing on the samples.  But she canceled the testing after reviewing Dr. Johnson's results on the beer can DNA.  Dr. Johnson's results from DQ-Alpha testing, the method Young used, matched Young's results.  Dr. Johnson had also performed the more advanced testing that Tanner had ordered (Polymarker testing), and using the more discriminating Polymarker test, Dr. Johnson was able to exclude Stites, Hall, and Selmala.  Because the more discriminating test excluded them, Tanner did not believe Young's report was exculpatory or that the beer cans were relevant.

At the post-conviction hearing, Reed's defense attorneys, Calvin Garvie and Lydia Clay-Jackson, testified that they never were provided Young's report during trial, and that they did not see Young's report until Reed's habeas counsel provided them with a copy.  While the defense attorneys agreed that the report could have affected the case—particularly, it could have helped explain how Fennell could have traveled back home in that it potentially placed Hall (a possible accomplice) at the scene—they also expressed concern that their expert, Dr. Johnson, had performed more specific testing that excluded Hall, Stites, and Selmala as donors of the DNA on the cans.  They also conceded that Officer Hall's wife, Carla Hall, verified her husband's testimony that Hall woke up to take care of their two-month-old daughter at 3:30 a.m. and left for work at 5:35 a.m. on the day of the murder.

The trial court found Tanner, Garvie, Clay-Jackson, Officer Hall, and Carla Hall credible. The judge also held that the State did not intentionally suppress Young's report.  While the trial court found that a fact issue remained concerning whether the defense attorneys actually received the report at trial, he concluded that it would not have affected the outcome of the trial.  The defense's

own expert had already yielded the same results and performed more discriminating testing that excluded Stites, Hall, and Selmala. The CCA held that Reed failed to demonstrate that his subsequent application for habeas corpus met any of the exceptions in Article 11.071 of the Texas Code of Criminal Procedure and therefore constituted an abuse of the writ.

### 2. Initial federal habeas writ

Reed then sought federal habeas corpus relief under 28 U.S.C. § 2254. After permitting limited discovery and depositions, the Court determined that Reed had not exhausted several of his claims in state court. Because some of the unexhausted claims arose out of evidence that was not discovered until the federal writ had been filed, it appeared that these claims would not be procedurally barred if raised in state court. Namely, the Court found that Reed's *Brady* claims, including his claim that the prosecution failed to disclose information related to several potentially important witnesses, Martha Barnett and the Praters, and his claim that his trial counsel rendered ineffective assistance for failing to properly examine or impeach the State's forensic evidence, might fit an exception to Texas's abuse of the writ statute. Clerk's Doc. No. 114.

The Court did not dismiss Reed's claims in order to allow him to exhaust his claims in state court because the AEDPA's stringent one-year statute of limitations could have barred him from seeking federal habeas review. Thus, the Court entered a stay of the federal writ in March of 2004, and directed Reed to exhaust these new claims in state court.

### 3. Subsequent state writ applications

Accordingly, in March of 2005, Reed filed another (his third) state application for a writ of habeas corpus. Reed again argued that the State violated *Brady*, not only by suppressing the DNA evidence from the beer cans, but also by suppressing other evidence, including:

- Information from Martha Barnett that she had seen Stites and Fennell on the morning Stites was murdered.

- Information from Mary Blackwell, a former academy classmate of Fennell's, that she heard Fennell state that he would strangle his girlfriend with a belt if he ever found out that she cheated on him.

- Information from Jennifer and Brenda Prater that they saw Stites on the morning Stites was murdered with a man—not Reed—with a dark complexion.

- Information that Fennell and other Giddings officers had a history of brutality. There was a lawsuit against the City of Giddings and several officers, including Police Chief Dennis Oltmann, and Keng submitted an affidavit in that case that recalled several allegations of misconduct and that he asked the Texas Rangers to investigate the allegations.

- Information from Pam Duncan, who dated Fennell, that Fennell was abusive, possessive, controlling, and racist.

Upon receipt of the third application, the CCA held that Reed's allegations regarding Barnett's and Blackwell's statements were not abuses of the writ, and directed the trial court to hold a hearing on those claims. In March of 2006, the trial court held that evidentiary hearing. The other allegations in Reed's third application were all dismissed as an abuse of the writ. This includes his claim of actual innocence, his other *Brady* claims, his claims that his trial and appellate counsel provided ineffective assistance of counsel, his claim that the court can have no confidence in the outcome of his trial, his claim that the State knowingly allowed Fennell to give false testimony, and his claim that Texas's capital sentencing statute unconstitutionally prohibits the judge from instructing the jury on the effect of a "no" vote by one juror.

After the evidentiary hearing, but before the CCA issued its order on the third application, in February 2007, Reed filed a fourth application, where he claimed that the State suppressed evidence that Fennell had an abusive relationship with Pamela Duncan shortly after Stites's murder.

9

Duncan submitted an affidavit that Fennell was abusive, possessive, jealous, and racist.  In July 2008, again, before the CCA had ruled on the third application, Reed filed a fifth application.  In this writ, he again argued that the State suppressed evidence of Fennell's bad character, and this time submitted evidence that Fennell abused his authority as a police officer to obtain sex.  In this application, Reed also claims that in a letter written shortly after Stites's murder, Fennell referenced Hall in a way that suggested that Hall might have been involved in or known about Fennell's role in Stites's murder.  And finally Reed offered evidence that the Bastrop Sheriff engaged in crimes of moral turpitude.  Reed claimed that all of this was both evidence of his innocence, and also *Brady* evidence.

On January 14, 2009. the CCA rejected all of the claims in the fourth and fifth applications and dismissed them as an abuse of the writ.  The CCA determined that the information regarding Pamela Duncan was available to Reed during his trial and his initial habeas application, so it dismissed this claim as an abuse of the writ.  On the fifth application, the CCA concluded that none of the new evidence suggested that Reed was actually innocent of the murder, and rejected the *Brady* claims as "conclusory and premised on nothing more than mere conjecture and speculation."

Reed filed his sixth and final application on April 21, 2009.  He again focused on Fennell's character.  This short application was more of an advisory to the court that Fennell had been convicted "of charges relating to the aggravated sexual assault and kidnapping of a woman in his police custody," supporting his allegations in his previous application that Fennell abused his position for sex.  The CCA dismissed this claim as an abuse of the writ.

10

4.      The CCA's 2008 Opinion.

With regard to Reed's third application (that filed immediately following this Court's order staying the federal case), after considering the evidence filed with trial court, and the testimony taken at the evidentiary hearings, the trial judge entered recommended findings of fact and conclusions of law on all of the issues raised by Reed in the third writ application.   These recommended findings were prepared by the State and were adopted wholesale by the trial court.   These findings were transmitted to the CCA, along with the trial judge's recommendation that the petition be denied. Uncharacteristically, the CCA did not simply adopt the trial court's proposed findings and conclusions.[2]   Rather, the CCA ordered supplemental briefing and set the matter for oral argument. The CCA then issued an opinion that fills almost sixty pages of the reporter denying relief on all of Reed's claims.   *Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008).   In this decision, the CCA did not blindly adopt the trial court's findings.   Instead, the CCA found that several of the trial court's findings were not supported by the record, and determined that it would afford no deference to those findings, though it would otherwise defer to findings that were supported.

As noted, while the third application was pending, but before a decision was rendered on it, Reed filed two more applications raising additional *Brady* allegations, and also asserted the evidence added support to his actual innocence claim.   Subsequent Application, Nos. WR-50,961-04, -05. In an 11-page order, the CCA dismissed both applications as abuses of the writ.   *Ex parte Reed*, Nos. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009).   Finally, before returning to federal court, Reed filed one last application, also denied as an abuse of the writ.   *Ex parte Reed*, No. WR-50,961-06

---

[2]In the undersigned's experience, the vast, vast majority of the time, the CCA issues a postcard denial of a habeas writ, simply adopting the trial judges proposed findings and conclusions.

(Tex. Crim. App. July 1, 2009).  Following all of this, on August 5, 2009, Reed filed an agreed

motion asking this Court to lift its stay, and requested that a scheduling order be put in place for the

case.  That was done, and Reed's 158-page Corrected Second Amended Petition was filed in this

Court on February 12, 2010, raising the claims set out above.  The State filed a 217-page response,

and Reed filed a 52-page reply.

### III.  Legal Framework

### A.    The Antiterrorism and Effective Death Penalty Act of 1996

The statutory authority of federal courts to issue habeas corpus relief for persons in state

custody is defined by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA).  It states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable
>        application of, clearly established Federal law, as determined by the Supreme
>        Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the
>        facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  By its terms, § 2254(d) bars re-litigation of any claim "adjudicated on the

merits" in state court, subject only to the exceptions in § 2254(d)(1) and (d)(2).  *See, e.g.*, *Harrington*

*v. Richter*, 562 U.S. — , 131 S. Ct. 770, 780–81 (2011).  Determining whether a state court's

decision resulted from an unreasonable legal or factual conclusion does not require the state court

to produce an opinion explaining the state court's reasoning.  *Id.*  A state court need not cite or even

be aware of Supreme Court decisions under § 2254(d).  *Id.* (citing *Early v. Packer*, 537 U.S. 3, 8

(2002) (per curiam)).  When a state court's decision is unaccompanied by an explanation, the habeas petitioner must show that there was no reasonable basis for the state court to deny relief.  *Id.*  This is so whether or not the state court reveals which of the elements in a multi-part claim it found insufficient; as the Supreme Court explained, § 2254(d) applies when a "claim"—not a component of one—has been adjudicated.  *Id.*

Federal habeas relief may not be granted for claims subject to § 2254(d) unless the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the Supreme Court, 28 U.S.C. § 2254(d)(1); *(Terry) Williams v. Taylor*, 529 U.S. 362, 412–13 (2000), or that it "involved an unreasonable application of" such law, § 2254(d)(1), or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). This is a "difficult to meet . . . and highly deferential standard," and "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. —, 131 S. Ct. 1388, 1398 (2011) (internal citations omitted).

Under the first prong, a decision is contrary to "clearly established federal law," if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Williams v. Taylor,* 529 U.S. 362, 405 (2000).  A state court decision involves an "unreasonable" application of clearly established Supreme Court precedent if the state court "correctly identifies the correct governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  *Id.* at 407–08.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id*. at 410.  Thus, as the Supreme Court has recently explained, "a federal habeas court may not issue the writ simply because that court

13

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, — U.S. — , 130 S. Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 411). "Rather, that application must be 'objectively unreasonable.'" *Id.* Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Id.* (internal citations omitted). "It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." *Harrington*, 131 S. Ct. at 786.

Section 2254(d)(2) speaks to factual determinations made by the state courts. *See* 28 U.S.C. § 2254(e)(1). While such determinations are presumed to be correct, the petitioner can rebut this presumption by clear and convincing evidence. *See id.* Absent an unreasonable determination in light of the record, deference must also be given to the state court's fact findings. *See* 28 U.S.C. § 2254(d)(2).

**B.     Defaulted Claims, Procedural Bar, and Cause & Prejudice—General Principles**

A federal habeas petitioner must first exhaust his remedies in State court prior to seeking federal habeas relief. *See* 28 U.S.C. § 2254(b)(1); *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). A petitioner has exhausted his claim when he has fairly presented the claims for which he seeks relief to the highest court of the State. *See Morris v. Dretke*, 379 F.3d 199, 204 (5th Cir. 2004). While a federal court may not grant relief on an unexhausted claim, it may deny relief on the merits of an unexhausted claim. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

14

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

In addition, federal habeas review is foreclosed if the state court declined to address the claim based on a state procedural rule that provides an "adequate" basis for relief, "independent" of the merits of the claim. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Texas has such a rule, known as the "abuse of the writ" doctrine, adopted in 1974, and codified in 1995 in TEX. CODE CRIM. PROC. art. 11.071 §§ 4 (non-capital felonies) & 5 (capital cases).[3]  The statute codifies three exceptions to the general rule that the CCA is barred from reviewing a second or successive state habeas writ: (1) when the factual or legal basis of the claim was not available when the first writ was filed; (2) when the petitioner is actually innocent of the crime; and (3) when the petitioner was not eligible for the

---

[3]The relevant portion of TEX. CODE CRIM. PROC. art. 11.071 § 5 reads:

(a)     If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

   (1)     the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

   (2)     by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

   (3)     by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

death penalty (or "actual innocence of the death penalty").  The State contends that all of Reed's claims dismissed at the state habeas level as abuses of the writ are procedurally barred here as well, as the CCA's decision to dismiss them rested on independent and adequate state law grounds.  Reed contests this, arguing both that Texas's abuse of the writ doctrine is not an "adequate" procedural bar, because the CCA applies it arbitrarily, and also that it is not an "independent" basis for a dismissal of federal claims, as the CCA necessarily considers the merits of constitutional issues when it makes an abuse of the writ determination.

### 1. "Adequacy"

On the "adequacy" front, Reed contends that the CCA has been arbitrary in its application of art. 11.071, and cites several CCA decisions in an attempt to support this.  The Court rejects this argument.  The cases Reed relies upon are not arbitrary decisions, but rather are based on the specifics of each case, and also reflect the evolution of the CCA's jurisprudence on when it would base its art. 11.071 § 5 decision on the substantive merits of the claim, a topic covered in the next section.  Further, Reed fails to cite any Fifth Circuit cases supporting the argument that the CCA has applied art. 11.071 in such an arbitrary fashion that a dismissal under the statute is not an "adequate" basis to procedurally bar a claim.

### 2. "Independence"

With regard to whether a CCA dismissal under art. 11.071 § 5 is "independent" of the merits of the issue, this highly complex question has been the focus of several recent Fifth Circuit cases: *Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010), *Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010), *Adams v. Thaler*, 421 F. App'x 322 (5th Cir. 2011), and *Washington v. Thaler*, No. 09-70028, 2012 WL 245236 (5th Cir. Jan. 26, 2012).  The *Rocha* opinion contains a detailed history of the abuse of

the writ doctrine in Texas, and the Fifth Circuit's treatment of dismissals under that doctrine in federal habeas cases. *Rocha*, 626 F.3d at 829–39. The court explains that from 1974 to 1994, the Fifth Circuit consistently held that the CCA's abuse of the writ determinations would not bar review of the claim in federal court, because Texas courts failed to apply the doctrine in a "strict or regular manner." *Id.* at 829. However, beginning in 1994, Texas courts remedied this, and as a result, the Fifth Circuit "developed an unbroken line of precedent holding that a successive state habeas application that had been dismissed as an abuse of the writ . . . had been dismissed on an independent and adequate state-law ground." *Id.* at 829–30. This changed in 2002, however, with the Supreme Court's decision in *Atkins v. Virginia*, as the CCA began to review the merits of post-*Atkins* supplemental writs before allowing them to proceed under §5(a)(1)'s "unavailability" exception. In other words, to be able to proceed with a state supplemental writ under *Atkins*, a Texas petitioner had to show both that the argument had been previously unavailable to him (which it would be in every pre-2002 case) and that the claim had at least prima facie merit. Having started down this road in 2002, the CCA was unable to stop, and by 2007 the two step inquiry for § 5(a)(1) supplemental writs was held to apply to all claims, not just *Atkins* claims. *Ex parte Campbell*, 226 S.W.3d 418, 420 (Tex. Crim. App. 2007).

This of course had an impact on when dismissal as an abuse of the writ would bar review in federal court. After an extensive review of the Fifth Circuit's cases during this period, Judge Higginbotham summarized the Fifth Circuit's jurisprudence in *Rocha*.

> In sum, *Rivera* holds that the CCA reaches the merits of an *Atkins* claim when it determines that the *Atkins* claim is prima facie without merit and dismisses the claim for failure to satisfy § 5(a)(1). *Ruiz* holds that we can reach the merits of a successive habeas claim that the CCA does not dismiss as an abuse of the writ under § 5(c) but rather denies on the merits. *Hughes* holds that a dismissal for failure to satisfy the

> ''factual or legal unavailability'' requirement of § 5(a)(1) rests on state-law grounds.
> And *Balentine II* holds . . . that we should not treat every dismissal under § 5(a)(1)
> as a dismissal on the merits. . . .

*Id.* at 838–39.  The next year, in *Adams*, the Circuit further summarized the state of their case law

on when an abuse of the writ determination is "independent:"

> We recently clarified our understanding of the Texas abuse of the writ doctrine in a
> pair of cases. [citing *Balentine* and *Rocha*].  Under *Balentine* and *Rocha*, we must
> first determine which of the subsections quoted above the TCCA relied upon in
> dismissing Adams's subsequent application. . . .  Where, as here, the TCCA does not
> identify the subsection on which it relied in dismissing the application as an abuse
> of the writ, we look to the application itself to determine the subsection the petitioner
> relied on in presenting his subsequent application to the TCCA.

421 F. App'x at 330.

In summary, then, whether the CCA's dismissal of a claim as an abuse of the writ will be

viewed as "independent" depends upon which subsection of art. 11.071 § 5 the CCA relied on for

its ruling, and whether it reviewed the merits of the constitutional argument as part of its analysis.

A determination that a claim is an abuse of the writ under 11.071 § 5(a)(1) could be independent of

the federal issue (because the claim was reasonably available to the petitioner at the time of his first

writ), or it could be based on the merits of the issue, and thus not independent.  The holding of

*Rocha* is that a determination that a claim is an abuse of the writ under § 5(a)(3) is necessarily

independent of the merits because "[a] claim that a prisoner is actually innocent of the death penalty

is legally distinct from a claim that a prisoner's trial counsel was constitutionally ineffective at

sentencing.  When the CCA rejects the former, it does not simultaneously decide the merits of the

latter."  *Rocha*, 626 F.3d at 839.[4]  Although the Court has been unable to find a Fifth Circuit case

---

[4]*See also Adams*, 421 F. App'x at 331, which states:

We squarely addressed the TCCA's summary dismissal of a claim under § 5(a)(3) in

directly on point with this, analytically, it would appear that the result would have to be the same

under § 5(a)(2), as that is the actual innocence exception, where the state court makes a parallel

determination to that under § 5(a)(3), only it does so applying *Schlup v. Delo*, 513 U.S. 298 (1995)

instead of *Sawyer v. Whitley*, 505 U.S. 333 (1992).

Further, when the CCA's decision is silent on which subsection of § 5 it dismissed under,

then the federal court must look to the petition to determine which subsection the petitioner relied

on for his argument that the subsequent claim was not an abuse of the writ.  The Court has found

only one case that explicitly discusses what a federal trial court is to do if *both* the CCA's order *and*

the subsequent application are unclear or silent on this point.  In that case, Judge Hittner concluded

that:

> When facing an indistinct order, a federal court looks to the arguments the inmate
> made when presenting his subsequent state application. . . . Gates did not rely on any
> portion of section 5(a) in asking the Court of Criminal Appeals to authorize
> successive habeas proceedings.  His failure to invoke any of the three statutory
> exceptions provided a sufficient basis for the Court of Criminal Appeals' summary
> dismissal.  In essence, the Court of Criminal Appeals would not need to touch upon
> federal law in making the purely procedural finding that Gates failed to meet any
> section 5(a) exception because he had not *briefed* any of them.

*Gates v. Thaler*, No. 09-2702, 2011 WL 4370182, at *4 (S.D. Tex. May 31, 2011) (citations omitted,

emphasis in original).  This is consistent with guidance from *Rocha*:

> we are required to presume that a state-court habeas decision does not rest on an
> independent state-law ground only if we first determine that the state-court decision

_____

> *Rocha*.  There, the TCCA specifically stated that Rocha's application had not met the
> requirements of section 5(a)(3) and the court dismissed the application as an abuse
> of the writ.  We held that the TCCA had dismissed Rocha's application on
> independent and adequate state-law procedural grounds, and we were thus prevented
> from reviewing the claims in the dismissed application because they were
> procedurally defaulted.

19

> we are reviewing "fairly appears to rest primarily on federal law, or to be interwoven
> with the federal law."

626 F.3d at 836–37 (quoting *Coleman*, 501 U.S. at 735); *see also Washington*, 2012 WL 245236,

at *4 ("our presumption that the TCCA dismisses claims on state law grounds is only undermined

if the opinion actually implicates federal law."). Or as Judge Sparks recently put it:

> "There must be more than silence. In some form, the state court has to make a fair
> indication that the merits of the claims were reached." A "fair indication" exists
> where one or more state court judges address the merits of a prisoner's claim, or
> where a merits review can be inferred from the parties' arguments at the state court.

*Panetti v. Thaler*, No. A-09-CA-774-SS, 2012 WL 290115, at *4 (W.D. Tex. Jan. 31, 2012) (citing

*Balentine*, 626 F.3d at 854).[5]

Applying all of this to Reed's case is not simple, for at least two reasons. First, he has filed

six separate writ applications, most with multiple claims, and as the latter five of these are

supplemental, the CCA's decisions on each of these must be analyzed individually, claim-by-claim,

to see if it addressed the merits of any of the claims. Second, with the exception of the detailed

opinion issued in 2008, the CCA's orders on dismissing Reed's claims as abuses of the writ are

vague, and do not state whether it concluded that a claim was "available" to Reed at the time of his

first writ, or whether it found that the claim did not have sufficient potential merit to warrant

permitting it to proceed as a supplemental claim. The former is an "independent" ground, while the

---

[5]If all of this sounds a bit like guessing, then a review of the dissent to the Fifth Circuit's
denial of rehearing *en banc* in *Rocha* and *Balentine* may be in order. There, Judge Dennis criticizes
the opinions as requiring federal courts to "examine ambiguous and obscure state court data to guess
that the unexplained dismissals of state habeas claims by the Texas Court of Criminal Appeals are
based on an independent and adequate state ground." *Rocha v. Thaler*, 628 F.3d 218, 219 (5th Cir.
2010) (Dennis, dissenting).

20

latter is not.  Regardless, given the state of the law, and the state of the record, the Court has little

choice but to wade into these waters and do its best to sort out the status of each of Reed's claims.[6]

### 3.        Cause and prejudice

Even if a claim has been  procedurally defaulted, that default may be excused in certain

circumstances.  Specifically, if a petitioner is able to show cause for the default, as well as actual

prejudice, then a procedural default will be excused and the petitioner will be permitted to raise the

claim in his federal writ.  *E.g., Ruiz v. Quarterman*, 460 F.3d 638, 643 (5th Cir. 2006).  Further,

where a petitioner can demonstrate that failure to consider a defaulted claim will result in a

fundamental miscarriage of justice, then the claim may be reviewed by the federal court.  *Hughes*

*v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008).  The "miscarriage of justice" exception applies

when the petitioner is actually innocent of the offense that gave rise to his conviction.  *Schlup v.*

*Delo*, 513 U.S. 298, 326–27 (1995).

Reed makes both types of claims to excuse his procedural default of many claims.  He makes

a general claim of actual innocence to excuse all of the defaulted claims, and then in addition to that

assertion, with regard to a few specific claims, Reed also claims that he can show cause and

prejudice for those defaults.  The Court will address the actual innocence argument first, and then

will address the claims of cause and prejudice as to this subset of specifically identified claims.

---

[6]Interestingly, in his opinion in *Rocha*, Judge Higginbotham implies that divining meaning from vague CCA decisions is child's play: "A boilerplate dismissal might be ambiguous. . . but finding clarity in ambiguity is the bread-and-butter work of a federal court of appeals."  *Rocha*, 626 F.3d at 837.  While a court of appeals might consider such work a millrun, after spending weeks with the various and sundry state court records in this case, the undersigned respectfully suggests that finding "clarity" in the CCA's "ambiguity" in this case is more like alchemy than buttering bread.

C.      **Reed's Claim of Actual Innocence**

As noted earlier, Reed makes a claim both that his alleged innocence is an independent ground for habeas relief (Claim 1), and that his innocence should also excuse his having procedurally defaulted several of his other claims. As for Reed's assertion that actual innocence should be the basis for a stand-alone habeas claim, that argument is foreclosed by Fifth Circuit precedent.[7] Thus, any stand-alone actual innocence claim is legally precluded by this precedent. Moreover, as is detailed in what follows, Reed has failed to make a convincing case that he is actually innocent of the murder of Stacey Stites. Thus, even if a stand-alone actual innocence claim were not precluded by existing law, Reed would still not be entitled to relief on that basis.

Where actual innocence does come into play under existing law is when a petitioner is relying on that claim to demonstrate cause and prejudice to set aside his procedural default of other claims. As the Supreme Court has explained,

> A petitioner's burden at th[is] gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt or, to remove the double negative, that more likely than not any reasonable juror would have a reasonable doubt.

*House v. Bell*, 547 U.S. 518, 538 (2006). In making this "probabilistic determination," the court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."

---

[7]"Consistently repeating the mantra that, to date, the Supreme Court of the United States has never expressly recognized actual innocence as a basis for habeas corpus relief in a death penalty case, [the Fifth Circuit] has uniformly rejected standalone claims of actual innocence as a constitutional ground for prohibiting imposition of the death penalty." *In re Swearingen*, 556 F.3d 344, 349 (5th Cir. 2009) (Weiner, concurring) (citing *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases)).

*Id.* at 537–38.  In this case, Reed relies on his innocence claim to excuse his default of several of the claims he made in his prior state petitions.  In the context of such a "gateway" claim, the Court will review the merits of this claim of innocence.

Reed made this very same claim of innocence to the CCA.  That court made clear that it was reviewing the claim for the very same reasons, and under the very same legal standards, as this Court must review it:

> A *Schlup* claim of innocence is not an independent constitutional claim; it is ''a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits.''  Because Article 11.071, Section 5(a)(2) was enacted in response to the Supreme Court's decision in *Schlup*, we conclude that standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2).

*Ex parte Reed*, 271 S.W.3d at 733 (footnotes and citations omitted).  The CCA then proceeded to consider all of the evidence from Reed's trial, as well as all of post-trial submissions and hearings, and rejected the claim, concluding that:

> all of the reliable evidence, both old and new, presented by Reed does not compel the conclusion that it is more likely than not that no reasonable juror would have voted to convict Reed.  Initially, we note that what separates this case from the majority of gateway-innocence cases is the complete lack of a cohesive theory of innocence.  Reed's claim of innocence is seriously disjointed and fragmented—he presents numerous alternative but critically incomplete theories.  By focusing on a romantic relationship between himself and Stacey as well as pointing to several alternative suspects—Fennell, Lawhon, and some unknown dark-skinned man—the new evidence before us fails to tell a complete, rational exculpatory narrative that exonerates Reed.  None of Reed's theories meets the gateway standard of innocence.

271 S.W.3d at 746.  Everything the CCA said about the innocence argument Reed presented to that court applies equally to the claim presented in this federal writ.  The argument reads far more like a scattershot attempt to cast doubt on the state's evidence than like a single, coherent theory

explaining why Reed is innocent, or why there is credible evidence from which a reasonable juror would have concluded that someone other than Reed murdered Stacey Stites. The CCA's analysis of the law and facts on this issue is thorough, thoughtful, and well-reasoned.

Nevertheless (and perhaps unsurprisingly given the CCA's conclusions), Reed argues that the CCA's conclusions must be reviewed by this Court *de novo*. Relying on the Supreme Court's decisions in *House v. Bell*, 547 U.S. 518 (2006), and *Schlup v. Delo*, 513 U.S. 298 (1995), Reed states that the Supreme Court has "explained that the innocence question [is] one in which deference to the trial court is not appropriate," and "this Court must review of [sic] Mr. Reed's innocence claim *de novo*, without deference to the state court findings regarding the evidence presented." Corrected Second Amended Petition at 38. The Court disagrees, as Reed's argument is based on a misreading of *House* and *Schlup* and fails to consider all of the provisions of the AEDPA.

There are very few published decisions on the direct question presented here: what level of deference, if any, is due to a state court's determination of a "gateway" claim of actual innocence? The one court that has directly addressed the issue is the Fourth Circuit in *Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010). In an opinion authored by Judge Wilkinson, the court carefully considered the *issue.* The court started with a proposition that Reed states correctly—a *Schlup* claim of actual innocence is not governed by AEDPA's rule that a federal habeas claim must be denied where that claim "was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), and thus §2254(d) does not require deferring to the state court on this issue. But that is where the analysis parts company with Reed's argument. *Sharpe* notes that even if a state court cannot adjudicate a *Schlup* claim for federal purposes, it still may "decide matters relevant to one, quite possibly in the course of deciding highly similar issues of state or federal law." *Sharpe*, 593 F.3d at 378. *Sharpe*

24

adds that while 2254(d) may not govern the question, 2254(e) does apply, and that section provides

that "a determination of a factual issue made by a State court shall be presumed to be correct." 28

U.S.C. § 2254(e)(1). Rejecting the very argument Reed makes here, the court stated that a "*de novo*

do-over*" would be contrary to the AEDPA, and would be asking the federal court to "substitute [its]

own judgment for the state court's credibility determinations, disregard the fact that the state courts

soundly assessed each of his contentions, and unfairly hindsight the performance of his own trial

counsel." *Sharpe*, 593 F.3d at 375. This, the court held, would "undermine[] the principles of

comity and federalism that the Supreme Court and Congress have set forth in the context of federal

habeas review." *Id.*

Thus, Judge Wilkinson concluded that:

The deference Section 2254(e)(1) requires has particular salience when a state court's
determinations closely track the legal issues before the federal habeas court. Where
a state court looks at the same body of relevant evidence and applies essentially the
same legal standard to that evidence that the federal court does under *Schlup*, Section
2254(e)(1) requires that the state court's findings of fact not be casually cast aside.

*Id.* at 379. As noted, the CCA expressly stated that it had reviewed Reed's innocence evidence—the

very same evidence presented here—under exactly (not even "essentially") the same legal standard

that applies here, the *Schlup* standard. As is the case here, in *Sharpe* the state habeas court had

entered detailed findings, and had explained its reasoning thoroughly. Noting this, the Fourth Circuit

held that:

Where the state court conducted an evidentiary hearing and explained its reasoning
with some care, it should be particularly difficult to establish clear and convincing
evidence of error on the state court's part. This is especially so when the court
resolved issues like witness credibility, which are "factual determinations" for
purposes of Section 2254(e)(1).

*Id.* at 378.  The same is the case here.  Given the context of the state court's decisions, and the CCA's detailed opinion, it will be "particularly difficult" for Reed to establish the clear and convincing evidence needed to allow the Court to disregard the CCA's findings.

A detailed explanation of why the CCA's decision on actual innocence is worthy of deference from this Court would entail simply repeating what the CCA itself has already stated in great detail, so the Court will not do that.  But it is worth reviewing the analysis, and pointing out why Reed's innocence argument is lacking.  The foundational point revolves around Reed's claim that he and Stacey Stites had a consensual intimate relationship.  Reed does not—indeed, given the DNA evidence, Reed cannot—deny that he had sex with Stacey Stites.  Thus, Reed's theory of innocence relies fundamentally on the assertion that he had consensual sex with Stites several days (or at least some time) prior to her murder.  Even if all of the other allegedly "new" evidence of innocence is credited, if this claim of a consensual sexual relationship is not one a reasonable juror would have believed, then Reed's entire claim of innocence falls apart, because other than consensual sex, the only rational explanation for how Reed's semen was in and on Stacey Stites' body is that he raped her.[8]  Thus, Reed's claim of a consensual relationship is effectively both the beginning and the end of his assertion of innocence, and for that reason the Court will focus most of its attention on that claim.

---

[8]And the converse is also true.  While it was not the only evidence implicating Reed in the murder, the DNA evidence and evidence suggesting rape was plainly the primary evidence relied upon by the State to prove Reed's guilt.  Thus, persuasive evidence that Reed and Stites had consensual sex days before the murder would have clearly undermined the State's evidence.  Further, given the evidence that Fennell was racially prejudiced, evidence of an interracial affair between Stites and Reed would also have provided a credible motive for Fennell to kill Stites.

While Reed originally told police he did not know Stacey Stites, he later stated that he had an affair with her but kept it from the police because he did not want them to suspect him of the murder. *Ex parte Reed*, 271 S.W.3d at 709–10. To support his story, Reed relies on a number of witnesses who allegedly confirm the two had a relationship. After a detailed review of this evidence, the CCA found these witnesses lacking in credibility. 271 S.W.3d at 735–37, 746–47. The court noted that the trial judge considered all of their affidavits as well as the State's responsive affidavits, and found that many of those claiming they had seen Reed and Stites together were Reed's cousins or parents, and many had criminal felony or misdemeanor convictions for charges involving dishonesty, such as theft. Moreover, none of the claims were credible, and they were largely inconsistent with known facts. These witnesses' claims that they had seen Reed with Stacey Stites, or that the two were dating, are the only evidence Reed has to offer in support of his claim of consensual sex. If that evidence is lacking—and it plainly is—then there is no other support for Reed's claim. And with no reasonable explanation for why his sperm was in and on Stacey Stites's body, Reed simply cannot demonstrate that a reasonable juror would have found him not guilty of her murder.[9]

---

[9]In his petition, Reed contends that even if there is evidence he raped Stites, this does not prove he murdered her. Corrected Second Amended Petition at 39–40. The CCA rejected this argument when Reed first raised it in his direct appeal. *Ex parte Reed*, 271 S.W.3d at 712 (citing opinion on Reed's direct appeal). In short, when taken in conjunction with the strong evidence of forced sex, and the overwhelming evidence that Stites was murdered by being strangled with her own belt and that the rape took place in close temporal proximity to the murder, the evidence of Reed having raped Stites is more than sufficient to support a finding that Reed also murdered her. Again, Reed offers no other rational explanation for how Stacey Stites came to be in a wooded area strangled, partially clothed, with the fly on her pants broken, her clothing ripped, her pants and underwear bunched at her hips, her anus abraded, her elbows bruised, *with his sperm in her vagina.*

It is worth noting how divergent from the norm Reed's DNA argument is.  In most post-conviction proceedings involving rape, the petitioner is using the *lack* of a DNA match to demonstrate his innocence.  Reed obviously cannot do that here, and instead is having to offer an explanation for the match.  Courts have given the lack of a DNA match so much evidentiary weight that in numerous cases the lack of a DNA match has been used to exonerate a convicted defendant, even when there is contradictory eyewitness and circumstantial evidence.[10]  The evidence of a DNA *match*—as here—should be no less powerful.  If Reed has no innocent explanation for the sperm found in Stacey Stites' vagina being his, then the DNA match is significant—indeed, in light of the other evidence noted in footnote 9, perhaps conclusive—evidence of his guilt.  And even if not conclusive, it is certainly powerful enough to overcome Reed's claim that other, less compelling evidence, would have led a reasonable juror to find Reed not guilty of rape and murder.

Because Reed's claim that he had an affair with Stacey Stites does not have credible evidentiary support, his claim of actual innocence is doomed.  Once the claim of a consensual relationship is rejected, Reed's other innocence-based claims are just not enough to overcome the damning DNA evidence.  For example, Reed contends that the collection of evidence at the crime

---

[10]For example, Prof. Brandon Garrett has noted that:

> In the decades after [*Manson v. Brathwaite*, 432 U.S. 98 (1977)] was decided, hundreds of individuals would be convicted based on eyewitness identifications, but these individuals would later be proven innocent by DNA testing. Those high-profile wrongful convictions made the dangers of eyewitness misidentifications more salient than ever before. In a recent book, I present a study exploring the role that eyewitness evidence played in the trials of the first 250 DNA exonerees. Just as social scientists would have predicted, the vast majority were convicted following suggestive identification procedures and initially uncertain eyewitnesses became absolutely certain by the time of trial.

Brandon L. Garrett, *Eyewitnesses and Exclusion*, 65 Vand. L. Rev. 451, 453–54 (2012).

scene was sloppy and cross-contaminated Stites's body, and this undermines the prosecution's contention that DNA found around Stites's anus and breasts showed that she had sex recently and it was not consensual. It simply doesn't matter if the semen leaked from her vagina to her anus because investigators improperly moved her body, or if the pubic tape lifts contaminated the DNA collected from Stites's breasts, because the fact is, regardless of where on Stites's body it was found, Rodney Reed's semen was found on her body, and without a consensual relationship between them, there is no innocent explanation for Reed's semen being *anywhere* on her body. Similarly, all of the discussion regarding sperm motility is of no moment unless there is evidence that Reed had sex with Stacey Stites before her murder.

The one category of "innocence" evidence that could be different is that involving Reed's claim that someone else committed the murder.[11] Reed points to two possibilities: Jimmy Fennell and David Lawhon. The CCA found claims that either Fennell or Lawhon killed Stites were not credible. In reaching those conclusions the CCA, as it did with all of Reed's innocence evidence, thoroughly reviewed all of the evidence compiled in the state court record. The CCA conceded that Fennell was not a good police officer and is not a good person. The evidence supports the conclusion that Fennell is a misogynist and a racist. He is in the state penitentiary as a result of pleading guilty to improper sexual activity in the context of his duties as a peace officer, after being charged with kidnapping and raping a woman. But this alone is not evidence that Fennell raped and killed his fiancé, any more than the (rather compelling) evidence submitted by the State in the

---

[11] There would still remain the question of how Reed's sperm got on Stites' body, but if in fact there was credible evidence that someone else murdered Stites, then Reed would probably be able to establish that a reasonable juror would not have convicted him had he or she been aware of that evidence.

punishment phase of Reed's trial that Reed had likely raped several other women is evidence that *Reed* raped Stites.[12]  Fennell was scrutinized by law enforcement more than any other suspect, and, as the CCA notes, the State was never able to develop convincing evidence that he was involved in Stites's murder.  The Court can find nothing in the CCA's analysis that is contrary to or involved an unreasonable application of clearly established federal law, nor is this decision by the CCA based on an unreasonable determination of the facts.  Indeed, its determination is exactly the opposite—it was thorough, reasonable, and based on a correct application of federal law.

The claim that Lawhon murdered Stites is even more suspect than that involving Fennell. David Lawhon was convicted of raping and murdering Mary Ann Ardlt just a few weeks after Stites was killed.  Reed submitted the statements of two minors also involved in Ardlt's rape that, immediately after killing Ardlt, Lawhon bragged that he "did that girl in Bastrop."  Law enforcement scrutinized Lawhon as a suspect as well, but were unable to develop any credible evidence that he was involved in any way in the rape and murder of Stacey Stites.  Fundamentally, the fact that Rodney Reed's semen, not David Lawhon's, was found on Stites body is rather compelling evidence that Lawhon was not Stites's murderer.

The CCA considered and rejected many other arguments that Reed presented in an attempt to meet the standard of actual innocence.  The CCA's decision that Reed did not show that he is

---

[12]Specifically, Reed's DNA evidence matched the rape kit on a 12-year-old victim and an indictment is currently pending in that case.  58 Reporter's Record 92.  His ex-girlfriend and mother to his two children pressed charges against him for sexual assault but dropped the charges.  59 Reporter's Record 34.  DNA evidence links Reed to the rape of "VH," and an indictment is also pending in that case.  59 Reporter's Record 128.  A former girlfriend who dated Reed told coworkers that he forced her to have sex but she refused to testify before a grand jury.  60 Reporter's Record 47–48, 66–67.  Finally, "LS" picked Reed out of a lineup after a man carjacked her and attacked her and attempted to sexually assault her.  62 Reporter's Record 76–78.

actually innocent of Stites's murder is well supported by the factual record, and is consistent with, and involved a reasoned application of, federal law.  Under the AEDPA and the general rules of deference and comity that pre-date the AEDPA, the CCA's decision is due significant deference from this Court.  Even if the Court were not required to defer to the CCA's determinations, the Court would reach the same conclusion the CCA did for the same reasons.  In the end, Reed has simply not established that he is actually innocent of the rape and murder of Stacey Stites.

As noted at the outset of this discussion, Reed relies on his innocence claim to resurrect a whole host of otherwise procedurally barred claims.  Because the innocence claim lacks merit, that argument will not be able to do service as a vehicle for excusing his defaulted claims.  Thus, the Court must review whether the CCA's dismissal of claims as abuses of the writ was "independent" of the federal issue such that the procedural bar applies, and, if so, also review Reed's assertion that on some of the claims there is cause and prejudice for default.

## D.    "Independence" and "Cause and Prejudice"—Application to Reed's Case

On the issue of whether the CCA's dismissal of Reed's subsequent claims as abuses of the writ was "independent" of the merits, Reed argues that the CCA's current two step process in place for subsequent applications under § 5(a)(1) means that the Court cannot know whether a dismissal as an abuse of the writ was independent unless the CCA makes that clear in its order of dismissal. Reed contends that because the CCA failed to do that here, the Court must err on the side of assuming that the dismissals were not made on an independent basis, and conclude that the dismissed claims are therefore not procedurally barred.  Petitioner's Response to State's Answer (Clerk's Doc. No. 158) at 11–13.  Reed also points out that the CCA's 2009 order addressing some of the

31

subsequently-raised claims includes statements suggesting that the reason for its finding was a merits-based decision.  *Id.* at 11–12.

Although Reed does not explicitly recognize this, this argument only applies to claims in which the CCA has found an abuse of the writ because the claim fails to meet the requirements of art. 11.071 § 5(a)(1).  As discussed in detail above, only under § 5(a)(1) does the CCA potentially consider the merits of the underlying constitutional claim in determining whether a subsequently filed claim is an abuse of the writ.  Claims filed late based on a gateway claim of actual innocence that are dismissed as an abuse of the writ are considered to have been dismissed on an independent state procedural ground.  *Supra* 18-19.  Of Reed's late-filed claims, four fall into this category:

- Claim 3 (ineffective assistance of trial counsel),

- Claim 4 (the cumulative effect of the *Brady* claims and his counsel's ineffectiveness undermines confidence in the outcome),

- Claim 5 (the State knowingly presented false testimony from Fennell), and

- Claim 6 (the Texas death penalty statute is unconstitutional for failing to inform jurors of the effect of one "no" vote).

Thus, because the Court has found Reed's actual innocence claim lacking, and because the CCA had an independent and adequate basis for dismissing these claims as an abuse of the writ, the Court is procedurally barred from considering these claims.

Finally on the issue of procedural default, Reed contends that even if the CCA's dismissal of his claims under the abuse of the writ doctrine was independent of the merits such that the procedural bar applies, on some of his claims he can show cause and prejudice to set aside the procedural default.  Specifically, on all of his *Brady* claims, Reed contends that the "State's conduct interfered with Mr. Reed's ability to present the claims in a more timely manner."  Petitioner's

Response to State's Answer (Clerk's Doc. No. 158) at 14.  And on his ineffective assistance of appellate counsel claims, he asserts that two factors prevented his timely assertion of the arguments: (1) his appellate counsel had a conflict of interest, and (2) the Texas death penalty habeas process forces a defendant to file his state habeas writ while his direct appeal is still underway, and thus claims of ineffective assistance on appeal cannot be timely filed in a first writ.  *Id.* at 15.  He does not make a cause and prejudice argument as to any other claims.

The Court will review these arguments claim-by-claim, and will discuss first whether the CCA's dismissal of a claim as an abuse of the writ under § 5(a)(1) was "independent," and, if so, whether Reed has shown cause and prejudice to allow the late pursuit of the claim in a subsequent writ.

### 1.    *Brady* claims.

Reed brings nine separate claims founded on the argument that the State failed to turn over exculpatory material to him in violation of the rule announced in *Brady v. Maryland*.  None of these claims were raised in Reed's initial state writ.  On two of the nine claims—the two involving the evidence from Barnett and Blackwell—the CCA determined that Reed had demonstrated entitlement to pursue the claims in a supplemental application, and those are thus preserved for review here.  The ninth claim is raised for the first time here, and has not been exhausted.  It is discussed in the next section.

The other six claims were dismissed as abuses of the writ.  Of the three possible bases for that ruling, the only basis that would apply would be that contained in art. 11.071 § 5(a)(1): "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous

application."[13]  As discussed in detail above, a decision under § 5(a)(1) can be based either on the

fact that the claim was available to the petitioner at the time of his first writ, or on a finding that the

merits of the *Brady* claim are wanting.  Only if a finding of the first sort is made is federal review

barred.  Thus, the Court must determine what the basis of the CCA's dismissal of each claim was.

This is complicated by Reed having employed a piecemeal approach to filing writs, and by the CCA

usually not providing any explanation for its dismissal of the claims in these many writs.

> a.        **DNA report**

Reed's claim regarding the State's failure to deliver its expert's report of DNA testing on

beer cans found near the crime scene was raised in his second writ, which was filed while his initial

writ was still pending before the trial court.  When it denied the initial writ, the CCA also dismissed

this new claim as an abuse of the writ, stating:

> This Court has also reviewed a document entitled "Supplemental Claim for Relief
> on Application for Writ of Habeas Corpus."  Because this document was filed after
> the deadline provided for an initial application for habeas corpus, we find it to be a
> subsequent application.  *See* Art. 11.071.  We further find that the document fails to
> meet one of the exceptions provided for in Section 5 of Article 11.071, and, thus, we
> have no authority to do anything other than dismiss this subsequent application as an
> abuse of the writ.  In dismissing the subsequent application, we also expressly reject
> all findings and conclusions related to this claim and deny any motions pending that
> relate to the claim.

*Ex parte Reed*, No. WR-50,961-01, 02 (Tex. Crim. App. Feb. 13, 2002).  Obviously, the order does

not state the basis for its finding.  Thus, as directed by *Adams v. Thaler*, the Court must "look to the

application itself to determine the subsection the petitioner relied on in presenting his subsequent

application."  421 F. App'x at 330.  That is little help here, however, because Reed's subsequent

---

[13]The other two possibilities are actual innocence, and actual innocence of the death penalty.
*See* art. 11.071 § 5(a)(2) and (3).  The Court has addressed the actual innocence argument separately,
and Reed does not contend that he is actually innocent of the death penalty.

petition does not even mention art. 11.071 § 5, much less any subpart of this statute, and it is silent regarding when he became aware of the factual basis for the claim.  As noted in the earlier discussion, in a similar situation, Judge Hittner recently determined that a petitioner's "failure to invoke" art 11.071 could itself provide an independent basis for dismissing such a claim, since the CCA " would not need to touch upon federal law in making the purely procedural finding that [the petitioner] failed to meet any section 5(a) exception because he had not *briefed* any of them."  *Gates v. Thaler*, No. 09–2702, 2011 WL 4370182, at *4 (S.D. Tex. May 31, 2011).  But this too does not seem to apply here, as the CCA's order states that the petition "fail[ed] to meet one of the exceptions provided for in Section 5 of Article 11.071," not that the petitioner failed to brief that issue.  Other cases suggest that to show that the dismissal was based on the merits, there must be "more than mere silence"; there must be something providing a "fair indication" that the CCA reached the merits of the issue.

In that regard, the trial court held an evidentiary hearing on this claim, and transmitted to the CCA 84 proposed findings of fact, and 10 proposed conclusions of law related to its merits.  One would think that the trial court would not have held a hearing on a claim that was barred as an abuse of the writ, particularly given that art. 11.071 § 5(c) states:

> On receipt of the copies of [a supplemental writ], the court of criminal appeals shall determine whether the requirements of Subsection (a) have been satisfied.  The convicting court may not take further action on the application before the court of criminal appeals issues an order finding that the requirements have been satisfied.  If the court of criminal appeals determines that the requirements have not been satisfied, the court shall issue an order dismissing the application as an abuse of the writ under this section.

35

TEX. CODE CRIM. PROC. art. 11.071 § 5(c).  Thus, the fact an evidentiary hearing was held suggests that *someone* thought that the requirements of § 5(a) had been met.[14]  On the other hand, in dismissing the claim as an abuse of the writ, the CCA "expressly reject[ed] all findings and conclusions related to this claim," and it is not clear why it would do that if it was making a determination based on the merits of the *Brady* argument, since those findings and conclusions go to the very heart of that claim.[15]  Then again, if the CCA believed that the claim was barred because Reed was or should have been aware of the factual basis for the claim sooner, why would it not have stated that in its order dismissing the claim as an abuse of the writ?  With due respect to Judge Higginbotham, the undersigned is at a loss knowing how he is to make "clarity" from all of this robust ambiguity.

Nevertheless, doing the best it can with this record—and this record being far from "clear"—the Court concludes that because there is no indication that the CCA believed it was making a merits-based decision to dismiss this claim as an abuse of the writ, the decision must have been founded on the procedural bar of art. 11.071 § 5, and not the merits "gloss" added by recent CCA decisions.  Such a dismissal is an independent and adequate state law basis for resolving the

---

[14]In all likelihood, the clerk of the trial court did not recognize the "Supplemental Claim for Relief on Application for Writ of Habeas Corpus" as a subsequent application, and thus did not transmit it to the CCA as required by art. 11.071 § 5(b).  The record does not contain any order of the CCA finding that the § 5(a) requirements had been met on this claim, and directing that an evidentiary hearing be held.  Thus, it appears likely that the CCA was not aware of the subsequent application until the trial court transmitted his proposed findings and conclusions to the CCA, and that the evidentiary hearing was held on the order of the trial court not the CCA, notwithstanding the terms of art. 11.071 § 5(c).

[15]None of those findings, however, address when Reed became aware of the factual basis of this claim.

claim, and the Court is thus barred from reviewing the claim absent a showing of cause and prejudice.[16]

With regard to cause and prejudice, Reed does not make a specific argument regarding this claim, but rather contends generally that the State's suppression of the evidence creates cause for the late filing of all of his *Brady* the claims. Of course, to demonstrate this there would, at a minimum, have to be evidence that the State had in fact suppressed the evidence. Consistent with the established pattern on this claim, the record is far from clear on this issue. Indeed, even after holding an evidentiary hearing, and taking live testimony from all of the attorneys and witnesses, the trial court was apparently unable to reach a conclusion regarding whether the report was suppressed: "There remains a legitimate fact issue as to whether Applicant's trial counsel actually received a copy of the May 13, 1998 DPS lab report during Applicant's trial." Conclusions of Law ¶ 80. The petition in this case argues that the first time the lab report was seen by anyone representing Reed was when the State filed its response to Reed's initial writ application, which contained the report as an exhibit. Corrected Second Amended Petition at 54 (Clerk's Doc. No. 147); *see also* Supplemental Motion for an Evidentiary Hearing, WR-50,961-01, -02, 2 Clerk's Record 367. Giving Reed the benefit of the doubt on this, it appears reasonable to conclude that there was cause for the late filing.

To show prejudice, Reed points to "the constitutional violation itself," relying on the substantive briefing in his petition and response. Petitioner's Response at 14 (Clerk's Doc. No. 158).

---

[16]On its face, this determination seems harsh, as it theoretically precludes the Court from reaching the merits of the claims. This is more theoretical than real, however, because the prejudice analysis aligns with the merits discussion, and thus, in the guise of a review of the prejudice issue, the Court reviews the merits of this claim.

The issue of materiality under *Brady* is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004). Therefore, Reed must show "a reasonable probability of a different result" to demonstrate the materiality of the allegedly suppressed evidence. *Id.* at 699.

In this argument, Reed claims that the prosecution failed to turn over a letter addressed to the State's lead prosecutor, Lisa Tanner, from the State's DNA expert, Wilson Young. Shortly before trial, on April 15th, Young, along with Reed's DNA expert, Elizabeth Johnson, swabbed the beer cans for saliva, on which both sides performed DQ-Alpha DNA testing. Both obtained the same results—Reed was not a donor, but the test could not rule out Stites, Officer Hall, or Investigator Selmala as donors. Young's letter transmitting these results to Tanner is dated May 13th, during the guilt/innocence phase of Reed's trial. On this date, the defense was presenting its case, but the trial was recessed because Johnson was the next witness and was unable to testify until the following day. Tanner states that under her normal course of action, she would have produced Young's results to Reed's defense team, but she did not have an independent memory of doing so, though her record keeping process suggested that she had produced the test results. Tanner admitted that she considered Young's preliminary results exculpatory, and that is why she believes that she produced them to the defense attorneys. Reed's counsel testified that they did not receive the results during trial. As already noted, in its findings of fact and conclusions of law, the trial court found both sides credible, despite the inherent contradiction, and only concluded that there was a "legitimate fact question" on the issue.

Upon receiving the results, Tanner ordered further, more refined testing to see if that testing could exclude Stites, Selmala, or Hall. At the same time, she sought the production of Johnson's

test results.  When she received those, she learned that Johnson had already conducted the more refined tests, which excluded Stites, Hall, and Selmala.  Because Johnson's report excluded Stites, Hall, and Selmala, Tanner concluded that there was no need to have the additional testing conducted, and canceled her order for those tests.  When Dr. Johnson testified, Reed's attorneys did not question her regarding her tests on the beer cans, given that her results were not helpful to Reed's defensive theories.

Reed cannot show that the State's alleged failure to produce the test results during trial prejudiced him, because he cannot show that the evidence was material.  Reed asks the Court to view the State's preliminary test results in a vacuum.  At the time the State first received Young's results, without any additional information, evidence that Officer Hall may have been near the scene could be exculpatory evidence, and Tanner admitted that she considered the initial test results exculpatory.  This was not the end result of the testing, however, but rather only one step in a process.  Tanner testified without contradiction that upon receipt of Young's results, the State immediately ordered additional testing, and would have gone forward with that testing had they not learned that Johnson had already conducted the tests.  Thus, even if the results had been produced, there is no evidence that they would have resulted in a contrary verdict, because the most likely outcome would have been that the jury would have been told by one of the two experts that DNA testing excluded Hall from being a donor to the DNA on the beer cans.

Further, Reed's prejudice argument amounts to this: had his attorneys been given Young's test results, they would not have called Johnson as a witness, so as to suppress her more refined testing results showing that Hall was excluded from the beer can DNA.  Instead, they would have put Young on the stand and offered into evidence Young's less-sophisticated results implicating Hall

as a possible donor to the saliva on the beer cans.  They would then have argued that this evidence

supported Reed's theory that Fennell killed Stacey Stites, as it suggested that Hall was at the murder

scene and provided Fennell a ride back to his apartment.  The flaw in this argument is the failure to

explain how the attorneys could have knowingly presented what amounted to misleading evidence,

given that they were in possession of more sophisticated DNA test results from their own expert

demonstrating that Young's results were incomplete.  Indeed, the trial lawyers themselves indicated

that they would have had reservations about pursuing this strategy for this very reason.  *Ex parte*

*Reed*, 271 S.W.3d at 715.

In sum, Reed cannot show that the DNA test report would have had any positive impact on

his defense, and thus he cannot show that he was prejudiced by the failure, if any, of the State to

produce it to him.  This also means that he cannot demonstrate the prejudice prong of the cause and

prejudice exception to the procedural bar rule.  And because the claim is procedurally barred, relief

on this claim should be denied.

### b.      The Praters' statements

In his third state application for habeas relief, Reed raised five *Brady* claims.  The first

restates the DNA report claim just disposed of, and the next two raised the Barnett and Blackwell

issues already discussed.  The remaining two related to the following evidence:

- Statements from Brenda, Jennifer, and Paul Prater that they saw Stites in the early morning hours on the day that she was murdered with persons other than Reed; and

- Evidence that Fennell and other Giddings police officers engaged in a pattern of brutality when interrogating suspects.

The CCA found that these claims failed to meet the requirements of § 5 and dismissed each of these

claims as an abuse of the writ.  *Ex parte Reed*, No. WR-50,961-03 (Tex. Crim. App. Oct. 19, 2005).

40

Following its common practice, the CCA did not specify whether it based its decision to dismiss these claims on the conclusion that the factual basis for the claims had been available to Reed, or because it had considered and rejected the merits of the claims. The Court must therefore look to Reed's petition for insight on this. In the subsequent petition, Reed contends that each of these claims satisfy art. 11.071 § 5(a)(1) because the "factual . . . basis for the claim was unavailable on the date the applicant filed the previous application." TEX. CRIM. PROC. art. 11.071 § 5(a)(1). He claims that none of the *Brady* evidence was available to his counsel until after he filed his original state habeas petition. Subsequent Application for a Writ of Habeas Corpus, No. WR50,961-03, at 84. Given this, and given that the CCA actually distinguished between the *Brady* claims in allowing two to go forward and dismissing the other claims, it would appear that the CCA based its abuse of the writ determination on a finding related to when the factual basis of the claims was available to Reed. This is an independent, procedurally-based decision, and bars further review unless Reed can establish cause and prejudice for his default of the claims.

To show cause Reed again relies on the general assertion that the factual bases of these claims could not have been known to him at the time of his initial writ. For the Prater claim, the Court agrees that the Praters' statements were not available to Reed's attorneys until this federal petition was proceeding, and thus there is cause for the late presentation of this claim. *See* Order dated March 24, 2004, at 6 (Clerk's Doc. No.114). With regard to prejudice, however, Reed once again fails to demonstrate "a reasonable probability of a different result" had the evidence not been suppressed. *Banks*, 540 U.S. at 699. In its 2008 opinion on Reed's third state writ application, in the context of Reed's actual innocence claim, the CCA reviewed the evidence on this issue in detail. It summarized its findings as follows:

41

The statements from Jennifer and Brenda Prater also fail to make a threshold showing of innocence. First, we question their reliability because they did not come forward with this information until September 2002, even though the investigation into Stacey's death was well known in Bastrop. Further, we find that Jennifer's credibility is also suspect because her husband, Paul, failed to corroborate his wife's account in an affidavit. However, we need not linger on this point. This evidence has no continuity with any of the other new evidence offered by Reed and does not fit within the chronicle of events that the trial evidence supports. Thus, when the information about Stacey from Jennifer and Brenda is viewed alongside the evidence at trial, we cannot say that Reed has established that it is more likely than not that no reasonable juror would have convicted him.

*Ex parte Reed*, 271 S.W.3d at 750–51. As noted in the discussion of the actual innocence issue, the AEDPA requires that on federal habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). These are all factual findings by the CCA. It based those findings on the detailed record developed on Reed's many state writ applications. Reed fails to demonstrate that there is clear and convincing evidence that these findings are erroneous, and as a result this Court must presume these findings to be correct. Given this, Reed cannot carry his burden of showing the materiality of the Praters' statements, and therefore cannot demonstrate the prejudice prong of his attempt to avoid the procedural bar that applies to this claim. Relief on this claim should therefore be denied.

### c.    Pamela Duncan

In his fourth application for habeas corpus, Reed claims that Pamela Duncan, a woman who dated Fennell several months after the murder, told the Giddings Police Department that Fennell was abusive. Although Reed admits that the Giddings Police Department was not the lead investigating agency, he claims that it participated in the investigation and its knowledge can be imputed to the State. The CCA determined that Reed failed to demonstrate that this information was not available during his trial or when he filed his initial application, so it dismissed this claim as an abuse of the

42

writ. *Ex parte Reed*, Nos. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009). This is an independent basis for the dismissal, and is therefore a procedural bar to this Court's review of the claim.

Because this claim is procedurally barred, the Court cannot review it unless Reed can demonstrate cause and prejudice. The CCA determined that Reed failed to demonstrate that the information related to Duncan was unavailable during his trial or when he filed his first petition. This is a factual finding. Accordingly, unless Reed shows by clear and convincing evidence that it was made in error by the CCA, this Court must defer to it. 28 U.S.C. § 2254(e). Reed has not presented any such evidence. Accordingly, because the information regarding Pamela Duncan was available to Reed at the time of the filing of his first state habeas writ, Reed cannot show cause for not raising it in that writ application. As a result, the Court cannot review the merits of this claim as it has been procedurally defaulted.

### d.   The Giddings Police Department's Reputation

In the last *Brady* claim raised in the third state writ, and dismissed by the CCA, Reed contends that the prosecution told the defense that investigators had thoroughly searched Fennell's life and yet they failed to turn over evidence that Fennell and other Giddings police officers routinely used excessive force, particularly against African Americans. Reed claims that there is cause for his procedural default of this claim because the prosecution withheld the evidence from his attorneys. Reed does not argue that the prosecution possessed particular knowledge about these incidents. Rather, he infers that the State knew about them based on lawsuits filed against Fennell and the other officers, and a former county attorney's requests to the police chief and Texas Rangers to investigate the department. Reed fails to explain how, if the prosecution must have known about Fennell and

the other officers' pattern of brutality based on the widespread knowledge of the activities and the public lawsuits filed against them, this information was unavailable to his lawyers. This claim is barred on independent and adequate state grounds. As this information was available to Reed at the time of his trial and at the time of his initial habeas petition, he cannot demonstrate cause, and therefore the Court does not need to consider prejudice.

      e.      **Fennell's Letter to the Giddings City Manager**

In his fourth state petition, Reed raised his last two *Brady* arguments, the first of which related to a letter Fennell wrote to the Giddings City Manager complaining about issues at the Giddings Police Department. In the letter, Fennell makes statements regarding Hall, which Reed contends suggest that Hall implicated Fennell in the murder at some time during the investigation. Reed contends that this is exculpatory evidence that should have been produced to him during trial and is evidence of his actual innocence under § 5(a)(2). The CCA rejected this latter argument and found that Reed did not establish that no reasonable juror would have rendered a guilty verdict beyond a reasonable doubt, and therefore dismissed his claim as an abuse of the writ. *Ex parte Reed*, Nos. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009). To the extent that Reed raised the argument as a *Brady* claim, the CCA dismissed it as an abuse of the writ, stating it was "conclusory and premised on nothing more than mere conjecture and speculation. Thus, Reed has not pled specific, particularized facts, that if true, would entitle him to relief." *Id.* This latter statement, though cryptic, appears to touch on the merits of the *Brady* argument. Such a decision is not independent of the merits of the constitutional claim, and thus will not act to bar this Court's consideration of the claim.

### f.      The Bastrop County Sheriff

Also in his fourth application for habeas corpus, Reed claimed that the State failed to produce evidence that the Bastrop County Sheriff, Richard Hernandez, was under investigation for various theft related allegations.  He claimed that Hernandez's improprieties and the Bastrop County Sheriff Department's possible complicity tainted the investigation, and he argued that it is evidence of his actual innocence under § 5(a)(2).  He also claimed that the evidence was exculpatory impeachment evidence of the Sheriff's office, and thus should have been produced under *Brady*.  In reviewing this claim, the CCA determined that it was insufficient to demonstrate Reed's actual innocence.  As a *Brady* claim, the CCA grouped it with the prior claim, and thus for the reasons just stated regarding that claim, the CCA's dismissal of this claim is also not independent of the merits of the constitutional claim, and does not bar this Court's consideration of the claim.

### 2.      Ineffectiveness of Appellate Counsel

In his initial state habeas petition, Reed claimed that his appellate counsel rendered ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendments, but he did not provide any arguments for why they were ineffective.  Application Nos. WR-50,961-01, 02, at 52.  Rather, he protested that he had to bring this claim before the CCA decided his direct appeal so he could not determine whether or how his appellate counsel failed him.  *Id.*  Further, any argument that his appellate counsel, who was currently representing him on direct appeal, was ineffective would create a conflict.  *Id.*  So he stated that he would resubmit his application on this point once the CCA rendered a final decision on his direct appeal.  *Id.*

In his third application, Reed followed up on his argument that his appellate counsel rendered ineffective assistance of counsel.  Subsequent Application No. WR-50,961-03, at 82.  He claimed

that, "Direct appeal counsels' performance was unreasonable under the prevailing professional norms and there is a reasonable probability that, but for appellate counsels' errors, Mr. Reed's conviction or death sentence would have been reversed on direct appeal." *Id.* at 83. He then listed four "potentially meritorious claims:"

(1)     the jury received an erroneous good conduct time instruction;

(2)     the jury did not receive an instruction informing them of the consequences if they could not reach unanimity during the penalty phase;

(3)     the trial court erred by not allowing Reed's attorney to include evidence of Lawhon's alleged confession in the record; and

(4)     the trial court erred by denying Reed's motion for a continuance.

*Id.* The application did not explain why these claims had potential merit; rather, it simply argued that "there is a reasonable probability that Mr. Reed would have prevailed on these claims had they been timely presented to the Texas Court of Criminal Appeals in his direct appeal brief." *Id.* The CCA was unpersuaded and dismissed his overarching claim that appellate counsel was ineffective as an abuse of the writ. *Ex parte Reed*, No. WR-50,961-03 (Tex. Crim. App. Oct. 19, 2005). The CCA determined that the claim did not satisfy art. 11.071, § 5(a), but the CCA did not identify the subsection of § 5 on which it based its decision. Looking at the underlying application, however, Reed argued that the claim was not barred because it satisfied the actual innocence prong in § 5(a)(2). Subsequent Application No. WR-50,961-03, at 84–86. Therefore, the Court can assume that the CCA determined that Reed did not satisfy § 5(a)(2) and dismissed his claim under an independent and adequate state ground. Accordingly, the Court is barred from reviewing this claim unless Reed can demonstrate cause and prejudice.

46

Reed can show cause for why he did not bring this claim in his initial habeas petition. As discussed, he included a section for inadequate appellate representation in his initial petition, but without the CCA's final determination, he could not adequately brief that argument. But he cannot demonstrate prejudice. To prevail on an ineffective assistance claim under the AEDPA, Reed faces a substantial obstacle. This Court must be "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). First, a court's review of counsel's performance must be highly deferential, with a strong presumption that the performance was reasonable. *Strickland*, 466 U.S. at 689; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). A court will not find ineffective assistance of counsel merely because it disagrees with counsel's strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). Moreover, "[a] fair assessment of attorney performance requires every effort to be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Next, the Court must defer to the state habeas court's determination of whether Reed's attorney provided ineffective counsel. The Supreme Court recently provided guidance to lower courts examining ineffective counsel claims under the AEDPA:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of §2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 785. So when this Court examines Reed's ineffective counsel claims, "the question is not whether counsel's actions were reasonable. The question is whether there is any

47

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).

As the State notes, nowhere in his habeas application, nor in the briefing before this Court, does Reed attempt to demonstrate why he contends that the underlying claims had merit. All he offers is his conclusory statement that there was a reasonable probability that he would have prevailed on them on his direct appeal. On a claim that an attorney was ineffective for failing to include an issue in an appeal, the petitioner bears the burden of demonstrating the missing argument had merit. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002); *Duhamel v. Collins*, 955 F.2d 962, 967 (5th Cir. 1992). Reed has failed to offer any argument in this regard. On that basis alone, Reed's assertion of prejudice fails. Further, in what follows, the Court addresses the weaknesses of the last two of the four arguments Reed contends his appellate counsel should have raised, and thus failing to raise those arguments could not have been ineffective. Because Reed has failed to show prejudice, this claim is procedurally barred from further review.

### E.    Summary—Claims Procedurally Barred

Thus, of all of the claims the CCA found to be abuses of the writ, there are two (the last two *Brady* claims just discussed) where that decision was not independent of the merits, and the claims are not barred. Further, Reed's assertion of a gateway claim of actual innocence is insufficient and does not act to excuse the procedural default of these claims. Finally, while Reed can demonstrate cause for his default on some of his claims, he cannot demonstrate prejudice as to these. Because these remaining defaulted claims do not fall within any exception to the procedural bar rule, this Court may not decide them. Referring to these claims by the numbering used in Section I of this Report and Recommendation, the barred claims are:

48

- the portion of the *Brady* arguments contained in Claim 2.a (failure to turn over letter related to DNA results), and 2.d through 2.f (suppression of statements of the Praters, statements of Pam Duncan, and evidence regarding the Giddings Police Department);

- Claim 3 (multiple assertions of ineffective assistance of counsel);

- Claim 4 (cumulative effect of *Brady* and ineffective assistance claims);

- Claim 5 (State's use of Fennell's allegedly false testimony),

- Claim 6 (unconstitutionality of Texas death penalty statute); and

- Claim 12 (ineffectiveness of appellate counsel).

Given the very clear federal law that a petitioner may not seek review on a claim that is procedurally barred, this Court need not, and indeed may not, review these claims, as they must be dismissed as beyond the Court's jurisdiction. *Kinsel v. Cain*, 647 F.3d 265, 273–74 (5th Cir. 2011). Accordingly, the Court will forego any further analysis on these claims.

In the section that follows. the Court addresses those claims that Reed has preserved for review.

## IV.  Analysis of Remaining Claims

### A.  The State deprived Reed of due process by suppressing evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

As just noted, many of Reed's *Brady* claims are procedurally barred. There are, however, a few of these claims that are procedurally appropriate for review. In *Brady v. Maryland*, the Supreme Court held that the suppression of evidence by the prosecution that is favorable to the accused and material to either guilt or punishment violates due process. 373 U.S. 83, 87 (1963). A *Brady* claim has three essential elements that must be proven by the petitioner: first, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is

impeaching;" second, "that evidence must have been suppressed by the State, either willfully or inadvertently;" and finally, "prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  The prejudice standard queries whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 698 (internal quotation marks omitted).  Therefore, Reed must show "a reasonable probability of a different result" to demonstrate the materiality of the allegedly suppressed evidence. *Id.* at 699. Reed has the burden of establishing all three prongs of the *Brady* test. *Banks v. Dretke*, 583 F.3d 295, 312 (5th Cir. 2009).

**1.      The State suppressed Martha Barnett's statement that she saw Stites with Fennell in the early morning hours on the day of her murder.**

Reed raised this claim in the application filed following this Court sending the case back to the CCA .  The CCA remanded this claim to the trial court, which held evidentiary hearings on the issue.  The issue was first raised by an affidavit of Martha Barnett submitted by Reed.  Barnett states in the affidavit that she saw Stites and Fennell between 5:00 and 5:30 a.m. on April 23, 1996, at the parking lot of the Old Frontier in Paige, Texas—a town between Giddings and Bastrop.  She recognized Stites from HEB and claimed that she later realized the man she saw with Stites was Fennell after she saw a photograph of him in the *Giddings Times and News*.  Steven Keng, a criminal defense attorney and the former Lee County Attorney, represented Barnett in 1997–98 on a DWI charge.  He also provided an affidavit in which he stated that Barnett told him in late 1997 or early 1998 that she saw Stites and Fennell on the morning of the murder.  Keng stated that he in turn told Bastrop County District Attorney Charles Penick.  Keng believed that he told Penick about Barnett's

story before Reed's trial.  Keng stated that in response Penick laughed and told him he had all of the evidence he needed and he did not want to hear anything more about the Reed case.

In 2001, Penick sued the Smithville newspapers for defamation after they reported that the Bastrop County District Attorney's Office engaged in prosecutorial misconduct during the Reed trial. While being deposed in the civil suit, Penick admitted to speaking with Keng and receiving the information regarding the alleged sighting of Stites and Fennell.  Penick thought Keng was making a joke because Keng did not say that he had exculpatory evidence.  During a subsequent deposition ordered by this Court in 2003, Penick provided more details about his conversation with Keng. Penick said that the conversation took place after Reed was convicted.  He thought it took place during an arraignment in the Amanda Sykes murder case, either in January or October of 2002. Penick thought Keng made the statement in response to the news articles accusing his office of misconduct, and Penick never could tell if Keng was serious or joking.  In response to this testimony, Reed submitted an additional affidavit from Keng, reiterating that the conversation took place before Reed's trial.  Keng reviewed his calendar and thought that the conversation took place in March or April of 1998, while he was in Bastrop County representing clients.

At the evidentiary hearing, Barnett, Penick, and Keng all testified, as did Reed's original defense counsel.  Barnett expanded on her earlier affidavit.  Barnett lived in Paige and commuted to work in Bastrop.  On the morning at issue, her shift started at 6:00 a.m., so she woke up at 4:00 a.m., readied her children for school, and took them to her mother's house.  Her mother lived only about a minute from her house.  She stayed at her mother's house for 20–25 minutes, then drove to the Old Frontier store in Paige on her way to work.  She stopped at the store at approximately 4:45 a.m. and saw a man and woman apparently arguing.  She recognized the woman as Stites, who she

knew from shopping at HEB.  The man and woman then entered a red truck.  Barnett could hear them arguing, even though the doors and windows of the truck were closed.  The truck was still in the parking lot when Barnett left for work, and she estimated that she arrived at work around 5:30 a.m.  Later, Barnett told her parents about what she had seen, and her mother, who knew Keng's father and had used Keng as her attorney several times, told her to talk to Keng.  Approximately a year later, in January of 1998, Barnett met with Keng because he was representing her on a driving while intoxicated charge.  By this time, she had realized the man was Fennell because she had seen his picture in a newspaper.

On cross-examination, Barnett admitted that the murder received a lot of attention in the area and she did not report what she saw to the authorities at the time of the murder, even though she knew they would have been interested in her information.  Further, the State questioned her timeline. In her affidavit, she claimed to have seen the couple between 5:00 and 5:30 a.m., but at the evidentiary hearing she stated that it was closer to 4:45 a.m.  The State suggested that she modified her statement to comport with the evidence that Fennell's truck was seen at 5:23 a.m. at the high school, which is 20–25 minutes away, though Barnett denied that she had.  The State also questioned Barnett's ability to get her four children ready, take them to their grandmother's house, visit with her mother for twenty minutes, and then get to the store, all in forty-five minutes.  The State asked Barnett, whose commute took about thirty minutes, why she would arrive for a 6:00 a.m. shift at 5:15.  While she conceded that she did not think she arrived that early, she also did not believe her arrival time was "closer to six" as the State suggested.

The State also challenged Barnett's motive for her testimony, noting that Fennell and Hall arrested Barnett for her DWI in November of 1997.  Fennell had also executed an arrest warrant

against Barnett in a theft case.  Two months after her DWI, Barnett told Keng it was Fennell with Stites on the morning of her murder.  To counter the State's insinuation that she had a bias against Fennell, Barnett testified that she was correctly arrested for her DWI because she was drunk—to the point where her intoxication affected her ability to recognize Fennell.  She also maintained that she did not execute the affidavit to retaliate against Fennell, but rather that she identified Fennell after seeing his picture in a paper.  The State offered evidence that none of the newspapers from Bastrop, Austin, and Giddings during the period from April 23, 1996, to May 30, 1998, contained a photo of Fennell.  Barnett conceded that she could not find a picture of Fennell in any of the papers; however, she thought that she must have seen it in a different paper.

Reed's trial lawyers, Garvie and Clay-Jackson, testified that they did not know about Barnett's sighting and that in their opinion it would have affected the trial.  They stated that Fennell did not have a verifiable alibi, and Barnett's sighting would have refuted his testimony that he was at home sleeping when Stites left for work.  Her testimony could also have challenged the State's theory of when Stites died, and by placing Fennell in Paige, Texas, Reed's lawyers could refute the State's contention that Fennell could not travel back to Giddings after the murder before the HEB employee called Stites's mother.  Because Barnett's testimony could inculpate Fennell, Reed's lawyers testified that they may have more diligently investigated Fennell's history of aggression towards women had they been aware of Barnett's evidence.

Keng also testified at the evidentiary hearing and maintained his position in his earlier affidavit.  He explained that Barnett approached him about representing her for her DWI and another civil matter, and she told him about what she had seen.  Keng talked to Penick in person because he believed that the information was important and, as District Attorney, Penick was in charge of the

prosecution.  Although Penick did not seem interested in speaking with his client, Keng did not speak with other authorities because he was confident that Penick would disclose the information as required.  As noted earlier, Penick admitted in a deposition to speaking to Keng about this matter. Thus, the important question was not if, but when the conversation took place.  In his hearing testimony, Keng remained confident that he spoke to Penick before Reed's trial and stated that the conversation took place in February or March of 1998.  The State noted that in his affidavit, Keng said it was March or April—which would be right before or during the trial.  In his previous statement, Keng said that he recognized the importance of Barnett's information when he saw a newspaper article explaining that Fennell was no longer a suspect.  The State showed Keng the first article to relay that information, and the article is dated in mid-May 1998.  In response, Keng said that Penick never told him the trial was over, and if it was over, Penick would have told him so, and he therefore believes the conversation took place before the trial ended, notwithstanding the date of the article.

At the hearing, Penick maintained his position that if he receives exculpatory evidence, he sends it to the defense.  He pointed out an example from this case, in which he provided the defense information about Elizabeth Keehner, who gave the prosecution an exculpatory statement.  Penick testified that he did not receive Keng's information about a potential witness before or during Reed's trial.  Penick said that if Keng had told him about Barnett, he would have investigated to see if she had exculpatory information, and if so, he would have given it to the defense.  He believed that Keng did not talk to him until almost four years after Reed's conviction, and he thought the conversation took place during the Sykes case, which took place between January and October of 2002.

54

The trial court made a detailed analysis of this testimony, and then the CCA did the same with regard to the trial court's findings. *Ex Parte Reed*, 271 S.W.3d at 729–32. It noted that Barnett's testimony had several problems: (1) Barnett claimed that she recognized Fennell from a newspaper photo, but his picture was not in the paper; (2) she didn't tell any of the authorities of the sighting for more than a year after the murder, despite the news coverage and the $50,000 reward; (3) Fennell arrested Barnett for a DWI shortly before she reportedly told Keng about seeing Fennell on the night of the murder; and (4) Barnett made several changes to her statement that would cast further suspicion on Fennell: she later said she saw the couple earlier in the morning and added that they were shouting at each other. The trial court also made credibility determinations, and as between Keng and Penick, the court found Penick to be the more credible witness. The CCA noted that the "trial judge . . . expressly found Penick to be credible. Because the trial judge was positioned to witness Penick's demeanor first-hand, we conclude that the trial judge's credibility determination and resultant factfindings are supported by the record." *Id.* at 731. The CCA also noted that even if the date of the disclosure to Penick is unknown, that is not terribly significant because Barnett's testimony would have been weak and subject to significant impeachment.

The Court can find nothing inconsistent with established federal law in the CCA's reasoning, nor has Reed succeeded in demonstrating by clear and convincing evidence that any of the trial court's or CCA's findings of fact were unreasonable in light of the record before them. Under the AEDPA, this Court must therefore defer to the state court's determination, and this claim should therefore be rejected.

**2.      The State suppressed Mary Blackwell's statement that she overheard Fennell claim he would choke Stites with a belt if he ever caught her cheating on him.**

Reed raised this claim in his first supplement to his writ application following the return of the case to state court. An evidentiary hearing was held on this claim as well. The issue was originally presented through the affidavit of Mary Blackwell—a licensed peace officer—in which she testified that she attended a training session at a Capital Council (CAPCO) training academy with Fennell in 1995. Blackwell observed Fennell interact with Stites and felt he was abusive and controlling towards her. During a break, she heard Fennell tell another student that if he found out his girlfriend was cheating on him, he would strangle her. Blackwell told Fennell that he would be caught because he would leave fingerprints, but Fennell said he that he wouldn't because he would use a belt.

In 1998, Blackwell was introduced to Captain John Vasquez, a retired captain from the Austin Police Department who was appointed to assist Reed's trial attorneys. During this time, Vasquez and Blackwell discussed Stites's murder. After learning about the details of the murder and the weapon used (strangulation with a belt), Blackwell told Vasquez about her conversation with Fennell. Reed also submitted an affidavit from Vasquez which recounts Blackwell's statements. He explains that he was appointed as an investigator to assist Reed's defense team. After Reed's conviction, he talked with Blackwell (at this point, she had changed her name to Mary Best) and did further investigation to confirm her story. When he discovered that Blackwell had indeed participated in a training session with Fennell, Vasquez talked to the Bastrop County District Attorney's Office. He believed he told Penick the information, but did not know what happened after speaking with him.

56

At the evidentiary hearing, Blackwell, Vasquez, and Forest Sanderson (an assistant Bastrop district attorney) all testified. Blackwell recalled her disgust at Fennell's attitude, both towards women, and regarding how he planned on using his authority as a police officer. Blackwell went to Stites's funeral and saw Fennell collapse with grief. She told her boss, Rocky Madrono, that she thought Fennell was faking. She also told him about the comments Fennell made while they were at the training session. In 1998, Vasquez approached Blackwell when he was working as Reed's investigator, and she told him about the conversation with Fennell. She said Fennell was talking to the cadet who sat on his right during the class, and with the aid of a class roster and class photograph, she identified the man Fennell was speaking to when she overheard him as Christopher Dezarn. However, she later stated that she could not remember who Fennell was talking to. She also admitted that she did not inform the authorities about Fennell's comment, even though she felt it could be significant.

Vasquez testified that he was visiting Madrono shortly after Reed's trial when Blackwell approached him and told him about Fennell's statement. He checked with CAPCO to confirm they attended the same session, and when he saw that they had, he wrote a memo recounting Blackwell's statement. At the hearing, however, he contradicted his earlier affidavit, and said he passed this information on to Forest Sanderson, a chief assistant district attorney in Bastrop County and a member of the trial team, not Penick. Vasquez said he did not contact Reed's defense team with the information because he was confident that the District Attorney's office would turn over the information to the defense team. While he originally planned on talking to Reed's appellate lawyers about this, he did not speak with them until they contacted him in either 2003 or 2004 during the habeas proceedings.

Sanderson also testified at the hearing and said that Vasquez did not give him the information and he would have remembered if he had. Dezaran also testified and denied that Fennell ever had a conversation with him regarding the manner in which Fennell would respond if his girlfriend was cheating on him. Further, and perhaps most significantly, the State had several investigators contact every person who attended the class, and they obtained statements from all of them except Fennell and Blackwell. None of them were able to corroborate Blackwell's claim regarding Fennell making statements about strangling his girlfriend if she cheated on him.

Once again, the trial court made detailed findings on this issue, and concluded that Blackwell's statements were not credible. The trial court also found that Vasquez's claim that he passed the information on to Penick or Sanderson was likewise not credible, and that Penick and Sanderson's testimony that they had never received any information from Vasquez was credible. The CCA could find no basis to reject these findings, as they were supported by the record and therefore adopted these findings. *Ex parte Reed*, 271 S.W.3d at 733. Further, the CCA questioned whether the claim was even properly considered as a *Brady* claim, given that it did not come to light until after trial, and Reed was not contending the statement was suppressed before or during trial. *Id.* at 732.

There are numerous reasons why all of the CCA's conclusions are entitled to deference under the AEDPA. The fact that no one who attended the CAPCO class could confirm hearing Fennell's statement seriously undermines Blackwell's credibility. Further, she waited to tell anyone about the statement until after the trial—despite being a peace officer, knowing about the case,[17] and knowing how the evidence could affect the trial. *Id.* at 724–25. Further, the state court found that Blackwell

---

[17]As noted, Blackwell attended Stites's funeral, and was thus aware of her murder.

did not disclose her statement until after the trial, so the State did not have the evidence before or during trial, and thus could not have disclosed it to the defense. *Id.* at 733. Because the Texas courts' conclusions on this claim are consistent with established federal law, and are based on a reasonable determination of the facts in light of the record, the Court must defer to those findings, and reject this claim.

3.       **The State suppressed evidence that the Bastrop County Sheriff was engaged in crimes of moral turpitude when his office was investigating Stites's murder.**

As noted earlier, Reed raised this claim in his fifth writ application. The CCA dismissed it as an abuse of the writ on its merits, though its explanation is brief, to be generous. *See Ex parte Reed*, Nos. WR-50,961-04, -05 (Tex. Crim. App. Jan. 14, 2009) (stating that Reed's *Brady* claims in that writ "are conclusory and premised on nothing more than mere conjecture and speculation."). Brief though it is, the Court must still defer to this finding under the AEDPA. *See Harrington*, 131 S. Ct. at 780–81 (stating that a state court's decision unaccompanied by an explanation requires a habeas petitioner to show that there was no reasonable basis for the state court to deny relief, as § 2254(d) applies when a "claim"—not a component of one—has been adjudicated).

Reed has very little to go on for this claim. His suggestion that the Bastrop County Sheriff's criminal acts, which were wholly unrelated to the Stacey Stites case, and did not involve any of the investigators who worked on the Stites case, were *Brady* evidence, asks far too much of the concept of exculpatory evidence. First, he fails to provide any evidence that the Sheriff's crimes were even known to anyone investigating the Stacey Stites murder. Rather, he suggests that simply because the Sheriff knew of his crimes, and the Sheriff's office was investigating the murder, then there was

somehow an obligation to turn this information over to Reed.  Apparently understanding that he has

no real evidence to support this argument, Reed relies on hyperbole instead:

> Importantly, employees of the Bastrop Sheriff's Office collaborated in [the Sheriff's] criminal activity for a decade without reporting it [referencing a press release from the Attorney General indicating that unnamed "on-the-clock county employees oversaw the prison labor used to improve Hernandez's residence].  The failure to disclose Sheriff Hernandez's crimes, and the complicity of the Bastrop County law enforcement team, constitutes a serious violation of the State's duty to disclose exculpatory evidence under Brady.

Corrected Second Amended Petition at 80 (Clerk's Doc. No. 147).  Despite these bold claims, Reed

offers absolutely no evidence than any of the investigators on the Stites case had anything to do with

the county's prison labor system, or Hernandez's misuse of it.

Further, Reed's claim that this evidence would have been "powerful impeachment of the

credibility of the State's investigation," massively overinflates the relevance of the evidence.  Indeed,

in all likelihood the evidence would not have been permitted, as both irrelevant and prejudicial.  The

evidence would have been clearly inadmissible under TEX. R. EVID. 608 and 609, as it would not

have related to the actions of any of the State's witnesses, nor would it have been admissible under

Rule 404.  Moreover, even if by some leap of the imagination the evidence was deemed relevant to

determining whether Rodney Reed was guilty of murdering Stacey Stites, it would appear to fall

squarely within the scope of TEX. R. EVID. 403, as any such relevance would have been strongly

outweighed by its potential to confuse the issues or mislead the jury.  As noted, the Court must defer

to the state court's rejection of this claim, and given all of the above, Reed cannot show there was

no reasonable basis for the CCA's rejection of the claim.

4.        **The State suppressed Fennell's Letter to the Giddings City Manager.**

In the same (fifth) habeas application, Reed claimed that the State violated *Brady* when it

suppressed a letter from Fennell to the Giddings City Manager that included the following:

> David Hall made several comments during the murder investigation of my fiancé.
> I have learned to forgive and forget.   But I understand Hall as does the other
> patrolman. . . . Hall is mad because he wants stripes.   He will burn anyone to get his
> position.   We are all aware of the problem and deal with it.

Subsequent Application, No. WR-50,961-05, Exh. 9.   As noted in the prior section, the CCA

dismissed this claim it as an abuse of the writ on its merits, with the brief statement that it was

"conclusory and premised on nothing more than mere conjecture and speculation," and the Court

must defer to that resolution.

Reed contends that Fennell's letter demonstrates that Fennell and Hall were no longer friends

and that Hall may have made comments during the murder investigation implicating Fennell.   This

argument is far too speculative to raise a *Brady* claim.   First, there is no evidence that the prosecution

was even aware of the letter.   Fennell sent it to the Giddings City Manager, complaining about

personnel and management problems within the Giddings Police Department.   The City of Giddings

was not part of the prosecution team, as Reed's own briefing admits.   *See* Corrected Second

Amended Petition at 80 (Clerk's Doc. No. 147) ("The Bastrop County Sheriff's Office, in

conjunction with Texas Ranger Rocky Wardlow, took the lead in the investigation of Ms. Stites'

murder.").   There would have been no reason for this letter to ever reach the consciousness of the

prosecution team, and there is no evidence that it did.   Further, there is no way to know what Fennell

was referring to regarding Hall's statements during the murder investigation.   They could have been

anything from comments insensitive to Fennell's loss, to statements suggesting that Fennell was the

murderer.  Reed gives us nothing to go on here.  It was plainly not inconsistent with federal law to reject such a thin claim, and the CCA's finding that this is "mere conjecture" is supported by the record.  We must defer to this resolution as under the AEDPA, and this claim should therefore be rejected.

> ### 5.    The State suppressed Wendy Wallace's statement that she was stalked and harassed by Fennell and Hall while they were Giddings Police Officers.

No Texas court has reviewed this claim.  Although this claim is unexhausted, because it lacks merit it should be dismissed.  As noted previously, while a federal court may not grant relief on an unexhausted claim, it may deny relief on such a claim.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Because this is the first place this claim has been presented, the only record on it is in the documents Reed has presented with his petition.

The entire factual basis for the claim is two pages of a Report of Investigation prepared by Texas Ranger Matthew Lindemann.  Petition Exh. 26.  That report appears to be a report of an investigation into Jimmy Fennell that took place in 2007, more than ten years after the murder, apparently as part of the criminal case against Fennell for assault and kidnaping.  In the report, Lindemann relates that in 2008 he met with Wendy Wallace, who recounted being chased by Fennell in his Giddings Police car while she rode her bike in Giddings sometime in 1996 or 1997.  She reported that after Fennell stalked her to her home she called the Giddings Police Department and asked who was driving a police car on her street, and was told "no one."  She further states that she had an odd call from David Hall at 3:00 in the morning seeking to get her to come out of her house

to corral some dogs. She states that she did not do so, because she didn't have any loose dogs. Finally, the report reflects that "Wallace contact[ed] Giddings Police after reading an article about Fennell in the newspaper." There is no information regarding the date of that newspaper story.

Reed argues that Wallace's statement was *Brady* material, and "it was not documented in any disclosures made to defense counsel." Corrected Second Amended Petition at 83. Of course, there is no evidence whatsoever that the prosecution was even aware of the incident, and because the Giddings Police Department was not involved in the investigation of Stacey Stites' murder, or the prosecution of Reed, there would have been no reason for the prosecution to have been aware of it. Further, the evidence does not exculpate Reed or link Fennell to Stites's murder. Rather, at best it is cumulative of other evidence suggesting Fennell's misogyny and assaultive behavior, which the state court has already correctly determined to be insufficient to have affected Reed's trial. *See Ex parte Reed*, Nos. WR-50, 961-04, -05 at 12 (denying Reed's claim based on Fennell's other bad acts); *see also Ex parte Reed*, No. WR-50, 961-06 at 3 ("The allegations of Fennell's misconduct and domestic violence do not exonerate [Reed]."). Accordingly, the statement, even if suppressed, was not material. The Court should deny relief on this claim.

**B.**    **Reed was deprived of his rights under the Eighth and Fourteenth Amendments when evidence of an extraneous offense for which Reed had previously been acquitted was admitted during the punishment phase of his trial.**

Reed raised this claim in his initial state habeas petition and it was denied. 2 Clerk's Record 545–47, 568. During the punishment phase of Reed's trial, the State introduced evidence relating to Reed's 1987 assault of Connie York. Reed was charged with raping York in her home after the investigation led the police to Reed. At first he denied having sex with York, but after investigators executed a search warrant to compare Reed's blood against evidence at the crime scene, Reed

changed his story and claimed that he had consensual sex with York. The prosecution in the Stites's trial went over the evidence from that case, including that a jury acquitted him in 1991.

Reed argues that the introduction of this evidence during the punishment phase of his trial offends the heightened reliability requirement of the Eighth Amendment as well as the principles of fundamental fairness inherent in the Fourteenth Amendment Due Process Clause. He argues that allowing the jury to consider evidence regarding a prior adjudicated offense for which he was acquitted undermines the accuracy of the jury's verdict in the penalty phase. He also argues that the State should not be allowed to essentially re-litigate the York case. Finally, he argues that because the State could not offer this evidence in a non-capital punishment phase, it violates the Constitution to allow the State to offer it in a capital case.

However, Reed's acquittal did not preclude the State from introducing evidence that he may have raped York during his penalty phase. Although due process requires the application of collateral estoppel, *Ashe v. Swenson*, 397 U.S. 436 (1970), that doctrine "does not preclude the State from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Dowling v. United States*, 493 U.S. 342, 349 (1990); *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002).

Rather than argue that *Harris* does not apply, Reed argues that *Harris* was wrongly decided because the court summarily rejected the collateral estoppel claim relying on *Vega v. Johnson*, which Reed claims does not present the same issue as that raised in *Harris*. However, in *Dowling*, the Supreme Court rejected a comparable due process challenge when the Government introduced evidence of an extraneous, previously acquitted case. *Dowling*, 493 U.S. at 349. The Court declined to extend principles of double jeopardy and due process to exclude "relevant and probative evidence

64

. . . simply because it relates to an alleged criminal conduct for which a defendant has been acquitted." *Id.* at 348. Thus, *Dowling* allows the introduction of evidence in a subsequent prosecution "if the prior acquittal did not determine an ultimate issue in the present case." *Vega*, 149 F.3d at 359 (quoting *Dowling*, 493 U.S. at 348).

Under *Dowling*, the State could introduce evidence suggesting that Reed raped York because the penalty phase has a lower burden of proof on the State. The State is not required to prove extraneous offenses offered during the punishment phase of a capital murder case beyond a reasonable doubt. *See Vega*, 149 F.3d at 359. Thus, the burden of proving the challenged evidence at Reed's punishment hearing was lower than the burden in the original prosecution.

Reed also argues that offering the evidence violated the Equal Protection Clause because the same evidence could not be admitted in a non-capital punishment phase. However, the Fifth Circuit has foreclosed this argument in *Harris v. Johnson*, 81 F.3d 535 (5th Cir. 1996). In *Harris*, the Fifth Circuit reasoned:

> Assuming arguendo that capital defendants and non-capital defendants are similarly situated, a parallel of which we are not persuaded, any disparate treatment would be rationally related to the State's legitimate interest in assuring that all relevant information is presented for consideration by a capital sentencing jury in the discharge of its onerous obligation.

*Id.* at 541. Reed fails to distinguish his claim from the claim in *Harris*. Because Reed failed to demonstrate that the State violated his constitutional rights when it introduced evidence suggesting that he raped York, his claim fails. The jury was informed that he was acquitted, and the case law precludes his argument.

**C.      Reed's right to due process under the Fourteenth Amendment was violated when the State implied during closing argument that defense counsel had suborned perjury.**

In this claim, Reed contends that the prosecutor improperly attacked the defense counsel during closing argument when he argued to the jury that defense witness Iris Lindley had "gotten her script wrong." Lindley was one of the witnesses Reed called at trial to demonstrate the existence of a relationship between him and Stacey Stites. Lindley was a friend of the Reed family, and she testified at trial regarding what she had seen from the porch of the Reeds' home one day in 1996:

Q:      Did anyone approach, any non-family member, approach the home when you were sitting there?

A:      Yes.

Q:      Can you described the person who approached?

A:      Well, she was maybe 5'5", she had dark brown hair, she was kind of heavy, on the heavy side, not too heavy, and when she walked up she asked for Rodney and Ms. Reed told her Rodney wasn't there, and she said would you tell Rodney that Stephanie came by.

Q:      Who came by?

A:      Stefanie.

Q:      Stefanie?

A:      Uh-huh. Stacey or Stephanie.

Q:      I'm sorry, Ms. Lindley what did you say her name was?

A:      Stacey.

Q:      I show you the contents of State's Exhibit 109. [Stacey's organizer that contained her driver's license]. Does this look like the young lady that came by?

A:      She was a little heavy-face.

Q:      A little heavy-faced?

66

A:      Uh-huh.

Q:      I show you the picture on State's 1 [a 16x20 blown up photograph of Stacey and her mother], does this look like the young lady?

A:      Yes, ma'am.

53 Reporter's Record 92–93.  She also identified the truck the woman drove up in as a "gray truck."

*Id.* at 96.  The evidence at trial was that Stites drove one of two vehicles—a red truck or her mother's

gray sedan.

> Based on this testimony, in closing the prosecution argued:

> So you hear from Ms. Lindley, Iris Lindley.  And usually when I talk to jurors I have to talk to you and say, you know, it's not like it is on TV, you don't usually get to cross-examine people like on TV.  Well, I can't say that here because Ms. Lindley is a witness who I must say is utterly devoid of credibility.  Utterly devoid.  And your job is to judge the credibility of the witnesses, and you have the right to believe all, none or some of what they say.  How much of what Ms. Lindley said are you going to believe?  She comes in here and tells you, "Yeah, I saw a girl come up and talk to Rodney."  "What was her name?"  "Stephanie."  "Stephanie?"  You saw Ms. Clay-Jackson go, "What did you say?"  And she said, "Stephanie."  And then you kind of see her go, uh-oh, I got my script wrong.

> * * *

> She got her script wrong, so then she says, "No, no, Stacey, Stacey.  Yeah, that's it, Stacey."  Okay, sure.  And then she says that this girl drove up in a gray truck.  I saw her in a gray truck.  Well, we know Stacey didn't drive a gray truck.  She got that part of the script wrong, too.  Then this is when it gets classic.  She [Ms. Clay-Jackson] shows her the driver's license picture.  "Is this the girl?"  "No."  So then we take this picture.  "Is this the girl?"  Well, gee, what do you think she's going to say now?  "Yeah, that's her."  Gheez.

56 Reporter's Record 58–59.  Reed's attorneys objected to the argument as "striking at the defendant

through counsel," and the trial judge overruled the objection.  *Id.* at 59.

> Reed raised this claim on direct appeal and in his initial state habeas petition, and both times

it was rejected.  2 Clerk's Record 533, 563–64.  While the CCA's order on the initial habeas is quite

spare on the reasons for rejecting the claim,[18] in the direct appeal the CCA concluded that although the argument was improper, it did not rise to the level of a constitutional violation, and was also harmless, given that it ultimately was addressed to credibility, a province of the jury, and given the strength of the State's case. *Reed v. State*, No. 73,135, *19-20 (Tex. Crim. App. Dec. 6, 2000). Nothing in this decision involves an incorrect application of federal law or an unreasonable determination of the facts. Indeed, in making its harmless error analysis, the CCA applied federal law, given that the applicable Texas Rule of Appellate Procedure (Rule 44.2(b)) "was taken directly from Federal Rule of Criminal Procedure 52(a)," and the CCA thus looked to federal law in construing and applying the harmless error rule. *Id* at 18. Given this, the Court must defer to the CCA's rejection of this claim, and similarly reject Reed's federal habeas claim on the same basis.

## C.  Reed's Fifth and Fourteenth Amendment rights were violated when the State commented on his failure to testify.

Reed raised this claim both on his direct appeal, and in his first habeas petition. It was rejected both times. *Reed v. State*, No. 73,135, *20–21 (Tex. Crim. App. Dec. 6, 2000); *Ex parte Reed*, Nos. WR-50,961-01, -02, Conclusions of Law 33–34 (Tex. Crim. App. Feb. 13, 2002). The state court determined that the prosecution commented on Reed not having an alibi, not on his decision not to testify. The argument—that Reed did not have an alibi—was made in rebuttal to Reed's argument that Fennell did not have an alibi:

---

[18]The court adopted the trial judge's proposed findings and conclusions without any comment. Those findings merely state, in conclusory fashion, that the state's argument was a permissible comment on Lindley's credibility, and that the argument was not striking at Reed. *Ex parte Reed*, No. 50,191-01, 02, Conclusions of Law 31-32 (Tex. Crim. App. Feb. 13, 2002). This is somewhat ironic, given that on the direct appeal, the CCA had previously concluded that the argument was improper.

And isn't it interesting that we've talked a lot about the fact that Jimmy didn't have an alibi. Jimmy didn't have an alibi for that night. Jimmy didn't have anybody accounting for his whereabouts because Stacey was the only one who could have accounted for his whereabouts. It's important to note that nobody could ever find anything inconsistent with what he told you. Nobody. They canvassed his apartment, they looked everywhere, and nobody could find anything inconsistent. But it's true, Jimmy didn't have an alibi. But ask yourselves, is there anyone else who didn't have an alibi? Is there anyone else who we've heard evidence about that didn't have an alibi? Yes, there is, the defendant.

56 Reporter's Record 76. The state court interpreted this comment as the State pointing out that no witness could vouch for Reed's whereabouts at the time of the murder, just as no one could vouch for Fennell's. The CCA noted that it is permissible to point out that a defendant has failed to present evidence (other than his own testimony) on an issue, and that such an argument is not necessarily a comment on the defendant's failure to testify. *Reed v. State*, No. 73,135, *20–21 (Tex. Crim. App. Dec. 6, 2000). This is a correct statement of Fifth Amendment law. *E,g, United States v. Green,* 324 F.3d 375, 381 (5th Cir. 2003) (stating that the Fifth Amendment is violated when the prosecutor's manifest intent is to comment on defendant's silence, or where the character of the remark was such that the jury would naturally and necessarily construe it as a comment of the defendant's silence). Further, read in context, as the argument must be, *Barrientes v. Johnson*, 221 F.3d 741, 780 (5th Cir. 2000), the CCA's view of the argument as not commenting on Reed's silence is not an unreasonable factual finding in light of the record.

Once again, because the CCA's rejection of this claim was consistent with established federal law, and based on a reasonable determination of the facts, this Court should deny relief on this claim.

**D.      The trial court interfered with Reed's Sixth and Fourteenth Amendment right to prepare a defense.**

Reed raised each of these claims in his initial state habeas petition and they were rejected by the CCA on their merits. 2 Clerk's Record 537–43, 565–66.  The trial judge made findings of fact and conclusions of law on each of the claims, and the CCA adopted those findings.  The Court will address each sub claim below.

**1.      Refusing to grant Reed's motion for a continuance.**

The parties each refer to *Avery v. Alabama* as setting forth the general rule with regard to preparation time for a defendant.  In *Avery*, the Supreme Court noted that while the Constitution does not explicitly specify any particular time period a defendant is entitled to before trial, "the denial of opportunity for . . . counsel to confer, to consult with the accused and to prepare his defense, could convert the [right to] . . . counsel into a sham and nothing more than formal compliance with the Constitution's requirement."  *Avery v. Alabama*, 308 U.S. 444, 446 (1940).  Thus, a defendant must be given adequate time to prepare before trial.  The trial court is vested with the discretion to determine when a continuance is necessary.  *United States v. Messervey*, 317 F.3d 457, 462 (5th Cir. 2002).

Reed had several attorneys prior to trial.  Initially, in May 1997, Jimmie Brown appeared on Reed's behalf as retained counsel, eight days after the indictment was returned.  Brown subsequently moved to withdraw, and Reed requested appointed counsel.  The trial court appointed Howard Jenkins to replace Brown, and later appointed Calvin Garvie as co-counsel with Mr. Jenkins.  The State's attorney provided Reed's new attorney with a complete set of discovery materials so that they would not have to rely on Mr. Brown to obtain those.  The court also directed the clerk to provide

the new counsel with a complete copy of the court file.  The court then reset the trial date from

January 20, 1998, to March 23, 1998, a date Reed's counsel indicated was sufficient for them to be

prepared.  Findings of Fact ¶ 254.  At a pretrial hearing on January 29, 1998, Reed requested that

Lydia Clay-Jackson be permitted to substitute into the case in place of Jenkins, and the trial court

granted that request.  Jenkins stated that he would provide all of his discovery materials to Clay-

Jackson.  On February 27, 1998, the defense counsel requested a continuance, pointing to the State's

voluminous witness list, containing 275 names, as cause.  The trial court denied his motion.  *Id.* ¶¶

257–59.   The State notes that when the witness list was provided to Reed's attorneys, it was

transmitted with a cover letter from the prosecutor stating,

> While I know that there are a very large number of names on the State's Witness List,
> let me assure you that I generally err in favor of over-inclusion. Virtually every name
> on the list is taken from some offense report or document that has previously been
> provided to you in discovery. Additionally, upon looking at the names, you can see
> that the bulk of the names are in reference to either some previous suspect or to an
> extraneous offense. You can safely assume that we cannot and will not come close
> to calling all of these people to testify.

*Id.* ¶ 257; 9 Reporter's Record 27–28; Pretrial Exhibit 7.  At the start of jury selection and trial,

Reed's counsel announced "not ready," but the trial court ordered the trial to proceed.

In reviewing Reed's habeas argument, the state habeas court determined that Reed was not

affected by the denial of the motion for continuance.  Reed failed to demonstrate that he was

surprised by any of the witnesses called at trial, that he was denied discovery of offense reports or

witness statements, that he could not call any witness, or that he would have defended his case

differently with more time.  Findings of Fact ¶¶ 260–64.  Further, he could not demonstrate that Dr.

Johnson had inadequate time to perform tests on the DNA evidence.  *Id.* ¶ 271.  Reed could not

demonstrate that he was disadvantaged by his counsel's inadequate preparation time and the court

did not abuse its discretion in denying his motion for a continuance.  Conclusions of Law ¶¶ 40–41.

The state habeas court also noted that Calvin Garvie had been on the case since October 1997, five

months before the trial commenced.  The court also found that Reed did not show that his counsel

was unprepared for any witness called by the State.

Reviewing the state trial record, and the evidence presented with Reed's post-conviction

writs, the Court cannot find anything in the CCA's factual determinations that is unreasonable, nor

did the CCA unreasonably apply federal law in reaching its conclusions.  Moreover, although Reed

makes general allegations in his pleadings before this Court that having sufficient time is essential

to preparing a defense to a capital case, he does not demonstrate with any specificity how his counsel

was unprepared to move forward with trial in his case in March 1998.  Given this, and deferring to

the CCA's findings and conclusions, the Court should deny relief on this claim.

### 2.      Excluding Jimmy Fennell's polygraph test results.

At trial, Reed's counsel sought to admit the results of two polygraph examinations

administered to Fennell, in which Fennell's responses on matters relating to Stites' murder were

considered "deceptive."  Findings of Fact ¶¶ 213, 215.  The judge sustained the State's objections

to this evidence.  *Id.* ¶ 217.  The CCA adopted the trial court's findings rejecting this claim.  Reed's

briefing fails to establish that this conclusion was incorrect legally, or relied on incorrect or

unreasonable factual findings.  The Fifth Circuit has addressed this very argument and rejected it,

holding that Texas's *per se* rule excluding polygraph results does not violate a criminal defendant's

constitutional right to present a defense.  *Castillo v. Johnson*, 141 F.3d 218, 221 (5th Cir. 1998).

Because it is precluded by Fifth Circuit precedent, this claim should be denied.

72

**3.      Appointing counsel for witnesses during the guilt/innocence phase of trial.**

In this claim, Reed complains that the trial court interfered with his defense when he appointed attorneys for two minors who were alleged to have been involved in the rape and murder of Mary Ann Ardlt, and those witnesses ultimately invoked their Fifth Amendment rights and declined to testify.  As noted previously, David Lawhon was convicted of this rape and murder. Jason Allison and Neal Hawken, both minors at the time, were present during the crime, and gave statements to law enforcement officers that immediately after killing Ardlt, Lawhon stated that he "did that girl in Bastrop too," apparently referring to Stacey Stites.  At trial, Reed attempted to call Allison and Hawken as witnesses to elicit this statement.

The trial court made detailed findings of fact on this claim, which the CCA adopted.  Those findings note that when Allison and Hawken were called to testify, the trial judge warned them of their right against self incrimination.  Jason Allison requested that the judge appoint him counsel. Findings of Fact ¶ 186.  Hawken did not invoke his Fifth Amendment right at this time, nor did he request counsel. *Id.* ¶ 188–89.  Defense counsel did not object to the judge's admonitions. *Id.* ¶ 190. Reed did not call Hawken at this time, however, but instead called another witness, and the court appointed an attorney to represent both Allison and Hawken related to their testifying.  Two days later, Hawken reappeared before the court and acknowledged that he requested an attorney, and stated that on the advice of his counsel he was declining to testify.  Again, Reed did not object. *Id.* ¶ 196.

The CCA found that Reed waived this claim when he failed to object to the court's admonitions to Hawken or to the court appointing Hawken counsel.  Conclusions of Law ¶ 14. Further, the admonitions were proper, Hawken's testimony that Lawhon admitted that he killed

Stites was not sufficiently corroborated to be admissible, and the substance of Hawken's testimony was introduced through other evidence. *Id.* ¶ 19. Specifically, Ranger L.R. Wardlow testified at trial to the fact that David Lawhon had bragged to others that he had murdered Stacey Stites. Findings of Fact ¶ 205. Thus, any testimony by Hawken would have been cumulative of this testimony.

This claim is unreviewable because the CCA found it procedurally barred, as Reed failed to contemporaneously object to the trial court's actions. The Fifth Circuit has held such a finding to be an adequate and independent state ground. *Fisher v. State*, 169 F.3d 295 (5th Cir. 1999). Moreover, the CCA's factual findings on this issue are reasonable, and are fully supported by the evidentiary record, and its resolution of this claim is consistent with established federal law. Under the AEDPA, the Court must therefore defer to those findings, and reject this claim.

### 4. Allowing the State to introduce evidence during the punishment phase of an extraneous offense for which he was previously acquitted.

Reed raises the substance of this claim in another of his arguments, and the Court has already addressed it above, finding it without merit. *Supra* pages 63–65. Because the admission of this evidence did not violate Reed's constitutional rights, the trial court admitting the evidence was also not a constitutional violation.

### E. Reed's Sixth Amendment right to counsel was violated because appellate counsel labored under an actual conflict of interest.

Reed argues that his appellate counsel, David Schulman, had a conflict of interest that violated his Sixth Amendment right to counsel because Schulman was representing Lawhon during Lawhon's state habeas proceedings at the same time that he was representing Reed in his direct appeal. One of Reed's defense theories was that Lawhon murdered Stites, and Reed argues that

Schulman—by representing Lawhon—could not effectively advocate because of this apparent conflict.

Reed raised this claim in his initial state habeas petition and it was rejected. 2 Clerk's Record 544–45, 567–68. The trial court entered findings of fact and conclusions of law and determined that Schulman represented David Lawhon after Lawhon pled guilty to murdering Mary Ann Arldt. Findings of Fact ¶ 293. This representation was unrelated to Stites's murder, and Schulman was not representing Lawhon during Reed's trial, when Reed attempted to call Lawhon to testify. *Id.* ¶¶ 294–95. Reed argued that he was prejudiced by the alleged conflict because he wanted Schulman to testify and disclose conversations he had with Lawhon that would inculpate Lawhon. *Id.* ¶ 298. Not only are those conversations protected by the attorney-client privilege, *Id.* ¶ 300, but also Schulman states in his affidavit that he "learned nothing that was either exculpatory as to my client in this case [Reed] or inculpatory as to Mr. Lawhon." *Id.* ¶ 299. Therefore, the trial court determined that Reed failed to demonstrate a conflict of interest, Conclusions of Law ¶ 58, and even if Schulman had a conflict, it did not prejudice Reed.

For a conflict to violate a client's Sixth Amendment rights, the lawyer must actively represent actually conflicting interests and that conflict must have an adverse effect on the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Reed fails to demonstrate an adverse effect. He claims that Schulman may have possessed information that could implicate Lawhon, and therefore exonerate Reed, in the Stites murder, but Schulman's attorney-client relationship with Lawhon would have prevented Schulman from making use of any such evidence on Reed's behalf during Reed's appeal. This overlooks the fact that Schulman could not divulge any incriminating information he may have learned from Lawhon—something Schulman denies he learned—whether

75

he represented Reed or not.  Thus, Reed would have been in the exact same position if an attorney

other than Schulman had represented him on appeal.  In that circumstance, the attorney would not

have had access to the privileged information.  Either way, if it is assumed that Lawhon informed

his attorney of information that was exculpatory as to Reed, that information was protected by the

attorney-client privilege and would have been unavailable to Reed, regardless of who his appellate

counsel was.  Finally, even assuming Schulman labored under a conflict of interest, Reed fails to

demonstrate how such an alleged conflict prejudiced him.  He fails to explain what Schulman failed

to do on appeal that he would have done had he not been representing Lawhon, or vice verse.

Without some tangible argument regarding how Schulman's alleged conflict negatively impacted

Reed, the existence of the conflict fails to raise an issue meriting habeas relief.  Accordingly, Reed's

claim fails.

There is nothing in the CCA's resolution of this claim that is inconsistent with established

federal law, or involved an unreasonable application of that law to the facts, and none of the CCA's

factual findings on this claim were unreasonable.  Under the AEDPA, this claim must therefore be

rejected.

**F.    Reed's death sentence violates the Sixth, Eighth, and Fourteenth Amendments because the State was not required to prove the mitigation special issue beyond a reasonable doubt as required by the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S.466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).**

The Court cannot find any place in the many state court writ applications where Reed raises

this claim.  In his petition, he makes no mention of where he exhausted this claim.  The State

(incorrectly) claims that the claim was dismissed by the CCA as an abuse of the writ.[19]  This is

---

[19]The State's briefing of the procedural default issue is sloppy.  The State fails to carefully examine when Reed's various claims were raised, or to address the CCA's treatment of the claims

incorrect.  Reed does not appear to have raised the claim in of the six state court writs he has filed in the ten years following his conviction.  It is therefore unexhausted.  Nevertheless, because the AEDPA specifically provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(2), the Court will address this claim.

Reed concedes that the merits of this issue have been rejected by the Fifth Circuit. Petitioner's Response to State's Answer (Clerk's Doc. No. 158) at 51.  He states that he raises it only to preserve it for later appeal.

In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  Two years later, the Supreme Court applied its rationale in *Apprendi* to a death penalty case.  *Ring v. Arizona*.  536 U.S. 584, 588–89 (2002).  Ring was convicted by a jury of felony murder, but Arizona law called on the sentencing

---

that were raised below.  This claim is a good example.  The State starts its discussion of this claim with this statement: "Reed's final claim is also defaulted.  *See* Section I, *supra*."  State's Answer at 214 (Clerk's Doc. No. 150).  (Such a broad citation—"Section I"—is of little help to the Court.)  In Section I, the State unfortunately does not discriminate among the different subsequent writs. Instead, the State argues that after this Court stayed the federal case, Reed

> returned to the state court to file a third, fourth, and fifth application for state habeas relief.  These applications included all of the claims now before this Court.  Notably, several of the claims included in these applications were dismissed by the Court of Criminal Appeals under 11.071 § 5 as an abuse of writ.  *See Ex parte Reed*, No. 50,191-03 (Tex.Crim.App. Oct. 19, 2005) (dismissing the third, fourth, fifth, sixth, seventh, and thirteenth claims raised by Reed in the current petition).

*Id.* at 92.  The present claim is referred to by the State as the thirteenth claim.  But that claim is not contained in any of Reed's subsequent petitions, nor was it dismissed by the CCA as an abuse of the writ.

judge to make an additional finding to impose the death penalty. *Id.* at 593–94. The Supreme Court noted that, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 596. Applying *Apprendi* to this sentencing scheme, the Court concluded that where an increase in punishment is contingent on an additional finding of fact, the Constitution requires that fact to be found by a jury beyond a reasonable doubt. *Id.* at 602. Thus, to the extent that Arizona's sentencing scheme "[allowed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty," it was held unconstitutional. *Id.* at 609.

Reed argues that these cases require that under Texas' capital sentencing scheme, the State must disprove the existence of mitigating evidence beyond a reasonable doubt. As noted, the Fifth Circuit has rejected that argument several times. *Paredes v. Quarterman,* 574 F.3d 281, 292 (5th Cir. 2009); *Ortiz v. Quarterman*, 504 F.3d 492, 504–05 (5th Cir. 2007); *Scheannette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007); *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006). The Circuit has concluded that the Texas statute requires that a jury determine all of the elements required to impose the death penalty, and the standard for each is " beyond a reasonable doubt." *Granados*, 455 F.3d at 536. The mitigation instruction is not an element of the death penalty, as it does "not . . . ask[] the jury to find an absence of mitigating circumstances beyond a reasonable doubt in addition to questions it required the jury to answer. . . . [Rather], a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Id.* Because this argument is precluded by settled circuit precedent, relief on this claim is foreclosed.

78

## V.  CONCLUSION

Since Mr. Reed's conviction, there has been much written and said, both in and out of court, claiming that he is innocent of the rape and murder of Stacey Stites.  What should make or break a habeas petitioner's assertion of innocence is a calm, dispassionate review of all of the evidence—"old and new, incriminating and exculpatory, without regard to whether it would . . . be admitted" in court.[20]  The undersigned has had this petition for writ of habeas corpus pending on his docket for more than 10 years (during much of which time the case was stayed to allow Reed to present additional claims to the Texas courts before pursuing them here).  Because I have no desire to be complicit in the execution of an innocent man, over this ten year period I have carefully read and re-read the trial transcript.  I have reviewed every piece of evidence that the parties have submitted since the trial.  I have watched the crime scene videotape, and viewed every scrap of the record.  I have read every single page of each submission Reed has filed.  And in none of this can I find a basis to believe that Rodney Reed is innocent of the rape and murder of Stacey Stites.

It is important to note that this is not a case—like so many others—where the conviction was based on faulty eyewitness testimony.  And it is also not a case where it appears that the police focused immediately on a likely suspect and succumbed to "tunnel vision," ignoring evidence pointing to other suspects.  Reed was never a suspect.  Never, that is, until the sperm found in Stacey Stites body was discovered to be a match to Reed's DNA.  Indeed, if anything, the police zeroed in on Jimmy Fennell, and spent nine months trying to develop persuasive evidence to convict him of the murder of Ms. Stites.  They were never able to do so.  And while the only forensic evidence that directly ties Reed to Stites is the DNA, this is not just any evidence.  As noted earlier, DNA evidence

---

[20]*House v. Bell*, 547 U.S. at 537–38.

has almost a special status in a case such as this.  This is because there is a scientific consensus that it is particularly reliable—indeed, incontrovertible—evidence of a person having been at a particular place.  In this instance, it is evidence of Rodney Reed having had sex with Stacey Stites.  Without reliable evidence demonstrating how this happened consensually, the DNA evidence effectively condemns Reed.  And what evidence is there of a prior relationship?  Statements of people who claim to have seen the two together.  Yet, many of these are the very sort of eyewitness accounts that have been shown in numerous cases to be unreliable.  Most of these witnesses did not know Stacey Stites, and identified her from memory by viewing her photograph.  Those who claimed to have known her were proven to be badly mistaken.[21]  All of these witnesses were family, friends, or associates of Reed's.  Reed was never able to identify anyone who was a friend, family member, or associate of Stacey Stites who claimed to have been aware of a relationship between Reed and Stites. In short, there is no reliable evidence that ties Reed to Stites before her murder.

In the end, this case has been thoroughly examined over the nearly 13 years that have passed since Reed was found guilty of the murder.  Thousands of pages of briefs have been filed on his

---

[21]Two examples of this are found in the statements of Meller Marie Aldridge and Jon Aldridge.  Meller Marie stated that she knew that Stites was the person she had seen with Reed because she knew she worked at the customer service counter at the Bastrop HEB, and was best friends with a Hispanic woman named "Rose" who also worked there.  Stites never worked at the customer service counter at the HEB, and no Hispanic woman named "Rose" ever worked there either.  Jon Aldridge claimed to have driven around with Reed and Stites, during which time they purchased and smoked crack cocaine.  He claimed that during this time Fennell, driving a Bastrop County Sheriff's vehicle, stopped them, and said he knew it was Fennell because Fennell had previously booked Aldridge into the Bastrop County Jail.  Fennell was a Giddings Police Officer at this time, not a Bastrop County Sheriff's deputy.  An exhaustive search of the booking records of the Bastrop County jail show no record of Fennell having ever booked Jon Aldridge into that jail.  And an analysis of 32 centimeters of Stites' hair showed that it contained no trace of cocaine or its metabolites, meaning that she had not consumed cocaine in the last 32 months of her life—which includes the time period during which she allegedly was smoking crack with Aldridge.

behalf.  Despite all of this, Reed has failed to make a persuasive case that a reasonable jury, hearing all of the evidence, would find him not guilty of the rape and murder of Stacey Stites.  Nor has he demonstrated that his trial was marred by any Constitutional error.

Accordingly, the undersigned **RECOMMENDS** that Petitioner's Corrected Second Amended Petition for Habeas Corpus Under 28 U.S.C. § 2254 (Clerk's Doc. No. 147) be **DENIED** and Respondent Thaler's Answer and Motion for Summary Judgment (Clerk's Doc. No. 150) be **GRANTED**.

## VI.  WARNING

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is

directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 15th day of June, 2012.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE